IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JFY PROPERTIES II LLC
*Plaintiff*,

v.                                                                    Civil Action No. ELH-17-1653

GUNTHER LAND, LLC, et al.
*Defendants*.

**MEMORANDUM OPINION**

In this trademark infringement case, plaintiff JFY Properties II LLC ("JFY") has filed an

Amended Complaint (ECF 30) against defendants Obrecht Commercial Real Estate, Inc.

("OCRE"); Gunther Headquarters, LLC ("Gunther Headquarters"); Gunther Land, LLC ("Gunther

Land"); and D.W. Wells Obrecht ("Mr. Obrecht").[1]  Gunther Land and third-party plaintiff Natty

Boh, LLC ("Natty Boh") filed a Counterclaim and Third-Party Complaint (collectively, the

"Counterclaim") against JFY.  ECF 13; ECF 14.[2]  The suits concern the parties' names for their

respective residential buildings in an area of Baltimore City known as Brewers Hill.[3]

JFY is the owner and developer of a multi-family apartment building in an area of

Baltimore City known as Brewers Hill, a historic district "just east" of the popular Canton

neighborhood in southeast Baltimore.  ECF 30, ¶ 1.  The building, named "The National," is

---

[1] Plaintiff initially filed suit against Mr. Obrecht, Gunther Land, OCRE, and Gunther
Headquarters.  ECF 1.  By marginal Order of July 27, 2017 (ECF 11), I approved plaintiff's Notice
of Voluntary Dismissal, without prejudice, as to Gunther Headquarters.  *See* ECF 10.  However,
in the Amended Complaint, filed January 12, 2018, Gunther Headquarters was again named as a
defendant.  *See* ECF 30.

[2] ECF 13 and ECF 14 are the same document.

[3] Photographs are included in an Appendix to this Memorandum Opinion.  Among the
large volume of exhibits submitted by the parties, the Court never located a photograph of JFY's
building.  As a result, the Court has obtained a photograph via the internet.  *See* Appendix.

located at 3600-3620 Dillon Street, on the footprint of a former warehouse for the National Brewing Company (the "Dillon Street Property").

Mr. Obrecht is the sole owner of OCRE, Gunther Headquarters, and Natty Boh, and he is the controlling owner of Gunther Land (collectively, the "Obrechts," the "Obrecht Parties," or "Obrecht Entities"). Gunther Land is the owner of property located at 3701 O'Donnell Street in Baltimore, under development as a multi-family apartment complex in the Brewers Hill Planned Unit Development ("PUD"). ECF 13, ¶ 3.

The PUD is a 30-acre site that was once home to both the National Brewing Company and the Gunther Brewing Company. ECF 52-1 at 5.[4] The Obrechts describe the location of the PUD as "the Canton industrial area of South Baltimore," ECF 13, ¶ 1, in the area "more commonly known as 'Brewers Hill.'" ECF 52-1 at 5. Natty Boh is the developer of the PUD. ECF 13, ¶ 4. The Obrechts assert that their proposed apartment building (the "Project") is marketed as both "THE NATIONAL APARTMENTS" and "THE NATIONAL APARTMENTS AT BREWERS HILL," and they seek to name the building "THE NATIONAL APARTMENTS AT BREWERS HILL." *Id.* ¶¶ 3, 12.

Since 2000, Mr. Obrecht and his entities have invested enormous sums of money to develop and revitalize the area comprising the PUD. JFY's Dillon Street Property is located across the street from the PUD. ECF 52-1 at 6, 8; ECF 52-5 at 4.

JFY's Amended Complaint seeks relief in three counts. Count I is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*. ECF 30, ¶ 73. JFY seeks a judgment declaring, *inter alia*, that "JFY is not making trademark use of The National and may continue to use "The National" in connection with the Dillon Street Property. *Id*. ¶ 80. Count II asserts a

---

[4] The Court cites to the pagination as it appears on the electronic docket.

claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a). *Id.* ¶¶ 81-84. In Count III, filed pursuant to 15 U.S.C. §§ 1119 and 1064, plaintiff asks the Court to cancel Gunther Land's registration of "The National Apartments" trademark, *id.* ¶¶ 85-89, claiming, *inter alia*, that the registration "was obtained fraudulently . . . and otherwise contrary to the provisions of 15 U.S.C. § 1054." *Id.* ¶ 86.

The Counterclaim asserts a claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a) (Count I), as well as common law claims for trademark infringement (Count II) and unfair competition (Count III). *See* ECF 13, ¶¶ 29-43. In addition, the counterclaimants seek to enjoin JFY "from using THE NATIONAL or BREWERS HILL marks, or any confusingly similar marks, to promote" the Dillon Street Property. *Id.* ¶ 43. The Counterclaim asserts, ECF 13, ¶ 12: "THE BREWERS HILL and THE NATIONAL trademarks have become synonymous with the high-quality development, buildings and offerings included in the Brewers Hill PUD."

Now pending are the parties' post-discovery cross-motions for summary judgment. JFY moves for summary judgment on all three counts of the Counterclaim and on Count III of the Amended Complaint, in which plaintiff seeks to cancel Gunther Land's registration. ECF 46. The motion is supported by a memorandum of law (ECF 46-2) (collectively, the "JFY Motion") and numerous exhibits. ECF 47-1 - ECF 47-55.

The Obrecht Entities oppose the JFY Motion and have filed a cross-motion for summary judgment (ECF 52), supported by a memorandum (ECF 52-1) (collectively, the "Obrecht Motion") and many exhibits. ECF 52-3 - ECF 52-28. They seek summary judgment on each of plaintiff's claims and on all three counts lodged in the Counterclaim. *See* ECF 52-1 at 7 n.2. Moreover, they seek an injunction "to enjoin JFY . . . from using the NATIONAL mark, or any other confusingly

similar mark, in any way, to advertise or promote the residential complex located" at the Dillon Street Property. *Id*. at 30.

JFY filed a combined opposition to the Obrecht Motion and a reply in support of the JFY Motion (ECF 61), supported by additional exhibits. ECF 61-1 - ECF 61-16; ECF 62. The Obrecht Parties replied (ECF 69) and submitted additional exhibits. ECF 69-1 - ECF 69-16; ECF 70-1.[5]

No hearing is necessary to resolve these motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the motions.

# I.      Factual Background[6]

## A.      The Dillon Street Property

David Penner is the managing member of JFY, a Maryland limited liability company formed in 2010. ECF 47-1 (Penner Affidavit), ¶ 2. On May 28, 2010, JFY acquired the Dillon Street Property through a public auction. ECF 47-1, Exhibit A-1 (Deed dated May 28, 2010). As noted, the property is located at 3600-3620 Dillon Street in the Brewers Hill area of Baltimore. *Id*.; *see also* ECF 14 at 2. [7]

---

[5] Several exhibits were filed under seal. I have not counted the pages of the parties' submissions, but it is safe to say that the parties have submitted hundreds and perhaps thousands of pages of exhibits.

[6] The factual background is drawn largely from the exhibits attached to the motions. In addition, the Court "may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[7] *See National Register of Historic Places Program: Brewers Hill Historic District*, NAT'L PARK SERV., https://www.nps.gov/nr/feature/places/14001070.htm.

Prior to JFY's ownership of the Dillon Street Property, the property was owned by Dillon Vat, LLC ("Dillon Vat"), which began to develop it. ECF 47-2 (Bond Affidavit), ¶ 3.[8] Dillon Vat, a Maryland limited liability company, was formed in 2005 but "no longer exists." *Id.* ¶ 2. John Vontran and Carroll L. Bond, III, also known as "Roy Bond," each owned a 50% interest in Dillon Vat. *Id.* ¶¶ 2, 6.

According to Mr. Bond, the Dillon Street Property is located on the site of the former "National Vat storage warehouse," which was used by the National Brewing Company for approximately 60 years "to store its beer." *Id.* ¶ 4. Mr. Bond asserts that the property was known historically as "the National Vat Building or the National Brewery Warehouse, or some variation of that." *Id.* Similarly, Mr. Vontran claims that the warehouse was called the "National Vat Building," ECF 47-2, ¶ 6, or the "old vat building." ECF 52-26 (Vontran Deposition) at 5, 7.

David Knipp, an OCRE employee, denied knowledge that the site once housed a warehouse belonging to the National Brewing Company. ECF 47-4 at 5, Tr. 23. But, he acknowledged that the property was "an integral part of the brewing company, as was everything on . . . Dillon Street." *Id.* And, Mr. Obrecht conceded that the property was called "a warehouse, a beer storage warehouse," although he claimed it was called "The Vat Building." ECF 47-5 at 3.

---

[8] For reasons that are unclear, JFY filed certain exhibits only in paper format. This includes the Penner Affidavit (ECF 47-1) and the Bond Affidavit (ECF 47-2), and several exhibits attached to the affidavits. Penner's Affidavit is signed but undated. *See* ECF 47-1 at 8.

Locating the exhibits appended to the affidavits has been difficult, because there are no dividers in the binder for these particular exhibits. Moreover, to the extent the exhibits were electronically filed, references do not always correspond to the electronic citations. And, for reasons that are unclear, JFY has filed multiple exhibits with separate deposition excerpts for the same witness. For example, approximately 15 exhibits pertain to deposition excerpts for Mr. Obrecht.

In the mid-to-late 2000s, Dillon Vat began construction of a "36-unit condominium building at 3610 Dillon Street, as well as four townhomes on the adjacent parcel . . . ." ECF 47-2, ¶ 6. According to Mr. Vontran, the construction used "the footprint and part of the original skeleton of the National Vat Building." *Id.* Dillon Vat planned to call the development "the Dillon Street Vat Apartments" because "the property was located on Dillon Street and it was the [site of the] old vat building." ECF 52-26 at 5. However, the "condominium project was never completed" and the "Dillon Street Property was eventually foreclosed and sold at auction" to JFY. ECF 47-2, ¶ 8.

In December 2005, Mr. Penner learned of the Dillon Street Property and its connection to the National Brewing Company when Mr. Bond gave Mr. Penner a tour of the building and explained the property's history to him. ECF 47-1, ¶ 4. During the tour, Mr. Bond referred to the property as "The National Vat Building." *Id.* ¶ 5.

After JFY acquired the Dillon Street Property in May 2010 (ECF 47-1, Ex. A-1), JFY "evaluated the property and decided to make the townhomes fee simple and to develop a 61-unit apartment building instead of proceeding further with the planned condominiums." ECF 46-2 at 5; *see* ECF 47-1, ¶ 9. Rezoning was necessary. *Id.* In 2011, JFY began demolition of the property, and in 2012 it conducted "some site work including soil testing." ECF 47-1, ¶ 10. In May 2015, JFY and the City entered into a "Traffic Mitigation Agreement For The National." ECF 47-21. Pursuant to its terms, JFY paid over $9,000 for certain "transportation improvements" in the "vicinity" of the development. *Id.* at 2. Construction of the building commenced in October 2015, following issuance of the building permit. *Id.*

Plaintiff marketed the Dillon Street Property as "The National." ECF 47-1, ¶ 12. In May 2017, the first tenant moved into The National. *Id.* ¶ 20; *see* Appendix. And, as of September 2018, the building was "approximately 90% tenant-occupied." ECF 47-1, ¶ 12.

JFY has submitted several exhibits that reflect reference to the Dillon Street Property as "The National" as early as 2005. ECF 47-2, ¶¶ 10, 11. These include a "Design Collective Plumbing Data Sheet" for the period November 14, 2005 through May 12, 2006, which refers to the property as "The National" (ECF 47-2, Exhibit B-1); a "Verified Complaint for Breach of Contract," filed on May 7, 2007, in the Circuit Court for Baltimore City, in a suit between Design Collective, Inc. and Dillon Vat (Case No. 24-C-07-003243), identifying the Dillon Street Property as "The National Brewing Company" (ECF 47-2, Exhibit B-2, ¶ 4); and an "Appraisal of Real Property," with an effective date of June 11, 2011, referring to the Dillon Street Property as "The National Condominium & Brewers Row Townhomes." ECF 47-2, Exhibit B-3.

In addition, the exhibits to ECF 47-1 include a professional services proposal sent by Design Collective, Inc. to Dillon Vat LLC on August 14, 2005. JFY Bates Stamp 000087-000102. It references "The Vat Building (National Brewing Company Warehouse)" at 3620 Dillon Street. *Id.* at JFY Bates Stamp 000087. In addition, the exhibits include a letter from Design Collective, Inc. dated October 30, 2006, referencing the "Project Name" as "The National." *See* JFY Bates Stamp 000086.

### B. The Brewers Hill Planned Unit Development

Pursuant to Baltimore City Ordinance 00-128, the Baltimore City Council approved the designation of various properties as the Brewers Hill Planned Unit Development.[9] The PUD was

---

[9] A PUD permits development that does not necessarily conform to existing zoning requirements. "Modern zoning ordinances . . . strive to meet society's current development needs" by providing "greater flexibility in zoning patterns." 5 ZIEGLER, RATHKOPF'S THE LAW OF ZONING

signed into law by the Mayor on December 20, 2000.  *See* ECF 13, ¶ 9; ECF 52-1 at 5.[10]  *See also*

Baltimore City Zoning Code, Art. 32, § 13-101 *et seq.*  The PUD consists of about 30 acres, and

is located in southeast Baltimore in an area called Brewers Hill, which was previously home to

both the National Brewing Company and the Gunther Brewing Company.

According to the Obrechts, the breweries vacated the area in the 1970's.  ECF 69 at 10.

Mr. Obrecht explained that "Brewers Hill refers to the whole complex," and is the "umbrella term

for the whole development."  ECF 52-3 (Mr. Obrecht Deposition) at 8.[11]  Since 2000, the Obrechts

have invested about $350 million in the development of the PUD, including the development of

more than 15 million square feet of office, retail, and residential spaces.  ECF 13, ¶ 17.  According

to the Obrecht Parties, Mr. Obrecht has "led the effort to transform this former industrial area into

an award-winning community."  ECF 52-1 at 5.  The PUD is now "home to a wide array of retail

---

AND PLANNING (4th Ed. Rev. 1994), § 63.01, at 63-2.  A PUD is a particular type of zoning
technique used "to obtain the level of flexibility needed to meet changing community needs."  *Id.*
at 63-3.  In contrast to Euclidean zoning, which "divide[s] a community into districts, and explicitly
mandate[s]" certain uses, *id.* at 63-4, the PUD is an "'instrument of land use control
which . . . permits a mixture of land uses on the same tract.'"  *Id.* (citation omitted).  Generally, it
"is a zoning technique that encompasses a variety of residential uses, and ancillary commercial,
and . . . industrial uses."  *Id.* at 63-5; *see, e.g.*, *Blentinger, LLC v. Cleanwater Linganore*, 456 Md.
272, 279, 173 A.3d 549, 552-53 (2017); *Rouse-Fairwood Development Ltd. Partnership v.
Supervisor of Assessments*, 138 Md. App. 589, 623, 773 A.3d 535, 555 (2001).

[10] Natty Boh subsequently moved to amend the "development sub-limits" and add "design
guidelines."  Balt. City Council Bill 06-0512.  By Ordinance 06-250, as amended by Ordinance
06-371, the City approved and the bill was signed on December 8, 2006.  In 2015, Natty Boh again
moved to amend the Brewers Hill PUD.  Balt. City Council Bill 15-0554.  It proposed to expand
the "boundaries" of the PUD to include businesses owned by the Obrecht Parties and other entities;
"to amend the permitted uses and their densities"; and "to generally provide for a mixed-use,
live/work/play urban development including, but not limited, to residential, office, retail, storage,
light industrial, light manufacturing, and research/laboratory.  On January 26, 2016, by Ordinance
16-443, the City approved and signed the bill.

[11] Mr. Obrecht testified in his personal capacity and as the corporate designee for the
Obrecht Entities.

businesses and restaurants, commercial and mixed use space and luxurious residential apartments." *Id.* The PUD has received numerous awards, ECF 13, ¶ 16, and the Obrechts claim it has had a "significant positive economic impact on the City . . . ." *Id.* ¶ 17.

The Obrecht Parties have marketed the PUD as "a combination of the old National brewery and Gunther brewery." ECF 52-3 at 7-8. They have "promoted a 'brewery' theme in every facet of the development's marketing campaign." ECF 52-1 at 5-6. They have endeavored "to restore and maintain historic" signage and "to pay tribute to the breweries . . . ." ECF 52-1 at 6; *see*, *e.g.*, ECF 52-3 at 6-7.

Over the course of many years, the Obrecht Parties regularly met with community associations to promote "the history of the breweries and how [they] were maintaining the historical integrity of the buildings . . . ." ECF 52-3 at 12-13. To this end, projects "would be labeled as National Brewery or National East or Natty Boh Tower through [their] signage, through [their] marketing brochures, through everything [the Obrechts] produced . . . ." ECF 52-3 at 13. An OCRE promotional brochure of an unspecified date described Brewers Hill as "a historic renovation and adaptive reuse of two landmark breweries, the Gunther Brewery and the former National Brewery, where 'Natty Boh' was first brewed." ECF 52-7 at 3.

The PUD includes the following properties owned by the Obrechts, or related entities,[12] and "[a]ll were historic redevelopments," ECF 47-6 (Mr. Obrecht deposition) at 10: (1) the NATTY BOH TOWER, located at 3600 O'Donnell Street, which is a commercial office building; (2) the GUNTHER HEADQUARTERS, located at 3601 O'Donnell Street, which is occupied by Cigna Healthcare and others; (3) the NATIONAL EAST building, located at 3700 O'Donnell

---

[12] Mr. Obrecht's many commercial entities are outlined in a document filed under seal at ECF 50. The Obrecht Entities that are defendants here do not include all of his corporate entities.

Street, with business tenants; (4) the GUNTHER BOTTLE, located at 3600 Boston Street, a retail shopping center with commercial office space; (5) the GUNTHER APARTMENTS, located at 1211 South Conkling Street, with 162 apartment units and a restaurant; (6) the PORTER BREWERS HILL, located at 3700 Toone Street, with 440 apartments[13]; and (7) the DOMAIN BREWERS HILL, located at 1200 South Conkling Street, with 182 apartments. ECF 47-6 (Mr. Obrecht deposition), at 6-12; *see also* ECF 13, ¶ 11.

The National Brewery properties are on the north side of O'Donnell Street, and the Gunther Brewery properties are on the south side of O'Donnell Street. ECF 52-3 at 3. The properties on the north side of O'Donnell Street include the Natty Boh Tower and the National East or "Natty East" building. *See* Appendix. As indicated, the Dillon Street Property, named The National, is not located within the boundaries of the PUD. ECF 52-5 (Penner Deposition) at 4. But, it sits directly across the street from the Natty Boh Tower and the National East building. *Id.*

In addition to the buildings described above, the PUD includes an undeveloped parcel owned by Gunther Land, located at 3701 O'Donnell Street. *Id.* Gunther Land plans to develop the lot into a 300+ unit apartment building, using "the marks at issue in this case – THE NATIONAL and BREWERS HILL – in connection with a planned apartment complex to be located within the Brewers Hill PUD at 3701 O'Donnell Street . . . ." ECF 52-1 at 6; *see* ECF 13, ¶ 3. Notably, "Natty Boh licensed to Gunther Land the rights to use the Brewers Hill and The National trademarks to promote the development, leasing and management of an apartment Project within the Brewers Hill PUD." ECF 42-6 at 13. And, the Obrechts intend to name the Project THE NATIONAL APARTMENTS AT BREWERS HILL, and to market it as THE NATIONAL

---

[13] As discussed, *infra*, this property was originally going to be called the National Apartments. *See* ECF 52-3 at 17; ECF 52-18.

APARTMENTS and THE NATIONAL APARTMENTS AT BREWERS HILL.  ECF 13, ¶¶ 3, 12; *see* ECF 52-11 at 2, 6 (images stating "coming soon" and "The National Apartments");  *see also id.* at 6 (www.thenationalapartments.com).

Of relevance here, the Obrechts formed "National East, LLC" in December 2001.  ECF 52-6.  It owns the National East building.  ECF 52-3 at 4.  The National East building was named for "the old bottling building for National brewery."  *Id.*  And, the Natty Boh Tower uses "the familiar name for National Bohemian which was the beer brewed by National brewery."  ECF 52-3 at 4; *see also* ECF 52-16 (Marketing Sample).

Notably, the name "The National" does not appear on the exterior of the National East building.  ECF 47-26 (Mr. Obrecht Deposition) at 3 ("Q. Do the words The National appear anywhere on the National East building? A. On the actual building, no.").  Rather, a "prominent AOL logo" appears on the outside of the building.  ECF 47-1, ¶ 21.   According to Mr. Penner, because of that signage, the National East Building is commonly referred to as the "AOL building." *Id*.

Mr. Obrecht explained that Natty East and the Natty Boh Tower both "have signage on them using the word National."  ECF 52-3 at 4.  He said, *id*.: "We have murals.  We have signage.  We have a whole host of marketing that surrounds National brewery and the use of The National, and really marketing the old brewery as a cool destination by taking advantage of the history of The National."  Further, the lobbies in both buildings contain brewery artifacts, such as signs and memorabilia relating to the National brewery.  *See* ECF 52-13 at 3; Appendix.

As part of this "overall brand strategy" and "theme," the Obrecht Parties licensed the "'Mr. Boh' logo, the iconic logo for National Bohemian beer once brewed at the site . . . ."  ECF 52-1 at 6.  A neon "Mr. Boh" is now situated "atop the Natty Boh Tower within the PUD . . . ."  *Id.*  They

also made use of the names of beers produced by the breweries, such as "Colt," "Stag," and "Duck." *Id.*[14]

In particular, pursuant to a License Agreement of May 9, 2003 ("Boh Man License"), Natty Boh, LLC acquired a 20-year license from Pabst Brewing Company ("Pabst") to use the Mr. Boh logo, a familiar if not famous symbol of National Bohemian beer, well known in Maryland. ECF 52-4 at 12-22. And, pursuant to the Addendum to the License Agreement of September 19, 2003 ("Natty Boh License"), Natty Boh, LLC also acquired the rights to use the phrase "Natty Boh." ECF 52-4 at 1-11. As Mr. Obrecht explained, the "huge Mr. Boh head" is "associate[d] with the National beers, Natty Boh, National Premium" and "was the logo for National Brewery." ECF 52-3 at 9.

Consistent with the branding effort of the Obrecht parties, in 2005 the Obrecht Parties renovated a bridge bearing the words "The NATIONAL BREWING Co.," which stretches across Dillon Street. ECF 52-3 at 5, 7. According to Mr. Obrecht, the bridge is "highly visible" on Dillon Street, *id.* at 5, and is located in close proximity to the National East building as well as the Dillon Street Property. *See* ECF 52-11 at 5 (Bridge Image); ECF 52-9 (Bridge Image from Dillon Street Property); *see also* Appendix.

With respect to the Natty Boh Tower, Frederick Gillis Green, former counsel for Gunther Land, stated that the building's lobby displays "references to The National and/or National Brewing Company" with "signs and memorabilia." ECF 52-10 (Green Deposition) at 4, Tr. 26. Moreover, as indicated, the Natty Boh Tower features a neon "Mr. Boh" logo on top of the

---

[14] The testimony of Mr. Obrecht was not clear in this regard. *See* ECF 52-3 at 5. According to JFY, "bottle cap" signs with beer names appear as decorations at the National East building. ECF 46-2 at 12. In support, JFY cites to Exhibit 5 to Mr. Obrecht's deposition, but the cite does not contain Exhibit 5. However, the record contains a building called "The Colt Building" at 3700 O'Donnell Street (ECF 47-27 at 4), which is also the address of the Natty East building.

building, which is a ten-story structure. And, a sign, "NATTY BOH TOWER," is displayed above the entrance to the building. ECF 52-8 at 7, 9-11 (Natty Boh Tower Marketing Sample); ECF 52-12 (Natty Boh Tower Image).

However, neither the Boh Man License nor the Natty Boh License provides the Obrechts with the right to exclusive use of the Boh Man image or to the words "Natty Boh." Indeed, the Boh Man License expressly disclaims such a right. ECF 52-4 at 21. It states, in pertinent part, *id.*:

> THE LICENSE HEREIN GRANTED ENTITLES LICENSEE TO USE THE "SMILING    BO [sic] MAN" IN THE ABOVE LABEL AS CONTAINED IN THE MARKED SQUARE    AND NO OTHER ITEM, WORD, OR MARK ON SAID LABEL.

The "LABEL" prominently features "NATIONAL BOHEMIAN BEER" in large capital letters. *See id.* Moreover, the Obrecht's use of the words "Boh Man" is limited to one building. ECF 52-4 at 2-3.

Nevertheless, according to Chris Molloy, Pabst's National Bohemian Brand Manager, Pabst is "aware" that the Obrecht Parties "have displayed memorabilia incorporating the 'National Bohemian' mark" to "market and promote" the PUD. ECF 70-1 (Affidavit of Chris Molloy), ¶¶ 5-6. Pabst "does not object" to the "use of marks incorporating the term 'National' and does not claim any trademark or service mark rights as a result of such use." *Id.* ¶ 5.

However, it is undisputed that other commercial entities in Baltimore also make use of the iconic Boh Man. For example, a prominent local jewelry store, Smyth, uses the Boh Man in its advertising. *See* ECF 61 at 11. And, the image also appears in signage at a popular restaurant in Canton, called Nacho Mama's. *Id.* But, in contrast to the Obrechts, both the jewelry store and the restaurant utilize the Boh Man figure along with their own trade names. *See* Appendix.

In addition to the National East building and the Natty Boh Tower, the Obrecht Parties have used the word "National" in the conception of a third property within the PUD. ECF 52-3 at

17. In 2008, the Obrecht Parties, as part of a joint venture, began the development of a 440-unit apartment building, located at 3700 Toone Street, which they initially planned to name "The National Apartments." *Id.* According to Mr. Obrecht, "all of the drawings, all of the signage, the entity names that owned [the project] were initially contemplated as being the National . . . ." *Id.* at 18. For example, a "Development Opportunity" packet was created for "The National: Brewers Hill," dated June 30, 2011, which outlined the plans for the project. ECF 52-20 [SEALED]. And, on July 7, 2011, the co-venturer named and registered the project as "The National Properties Limited Partnership." ECF 52-17 (National Properties Registration).

Ultimately, the parties decided to call that structure "Hanover Brewers Hill," and it was later renamed "Porter Brewers Hill." ECF 52-3 at 17-18. As a result, the Obrecht Parties decided to use "The National Apartments" for the Project, to be located at 3701 O'Donnell Street. *Id.* at 18.

## C. The Registration of "The National Apartments"

On February 1, 2011, Mr. Obrecht purchased numerous website domains, including thenationalapartments.com, thenationalapartments.net, nationalbrewershill.com, and nationalbrewershill.net. ECF 52-22 (Purchased Domains) at 2-18. In a "Bill of Sale" of June 29, 2017 (ECF 52-22 at 19), Mr. Obrecht assigned the rights to use such domain names to Gunther Land, with the intent of marketing the planned apartments as "The National Apartments" or "The National Apartments at Brewers Hill."

On November 18, 2015, while JFY's construction was underway for its building, and approximately 15 years after creation of the PUD, Gunther Land filed two intent-to-use trademark registration applications ("ITU Applications") with the United States Patent and Trademark Office ("USPTO"). ECF 47-9 at 2-9. The ITU Applications sought to register two marks: "The National

Apartments" and "The National Apartments at Brewers Hill." *Id*. The ITU Applications included the following description of services, *id*. at 5:

> International Class 036: Apartment and office rental; Apartment house management; Leasing of apartments; Management of apartments; Real estate listing services for housing rentals and apartment rentals; Real estate services, namely, property management services for condominium associations, homeowner associations and apartment buildings; Real estate services, namely, rental of short-term furnished apartments; Rental of apartments; Rental of apartments and offices; Rental of apartments in apartment community; renting of apartments.

On the same date, November 18, 2015, Gunther Land filed a trademark registration application with the Maryland Department of Assessments and Taxation ("MDAT") for State protection of the following marks: "The National Apartments," "Brewers Hills Apartments," and "The National Apartments at Brewers Hill." ECF 52-24. The State approved the registrations on November 25, 2015. *Id*.

The USPTO issued a Notice of Allowance ("NOA") on July 5, 2016, approving the ITU Applications ("ITU Registrations"). ECF 47-9 at 8. The NOA provided, *inter alia*, that Gunther Land had "six (6) MONTHS from the NOA issue date" either to file a Statement of Use ("SOU"), if Gunther Land "is using the mark in commerce," or an "Extension Request," if it "is not yet using the mark in commerce." *Id*.

Thereafter, on January 5, 2017, Gunther Land filed SOUs, requesting the registration of "The National Apartments" and "The National Apartments at Brewers Hill" on the USPTO's principal register. ECF 47-9 at 10-22. With respect to "The National Apartments" mark, the SOU listed November 18, 2015, as the "First Use in Commerce Date" and the "First Use Anywhere Date." *Id*. at 11. Gunther Land also submitted a receipt for an advertisement of the apartment building, a receipt from MDAT, and a copy of a webpage rendering of the apartment building, captioned "THE NATIONAL APARTMENTS: website coming soon." *Id*. at 21.

Initially, the USPTO rejected both SOUs in a Non-Final Office Action dated February 17, 2017. ECF 47-9 at 23-25. As to "The National Apartments" mark, the USPTO Examining Attorney explained, *id*. at 24:

> Registration is refused because the specimen does not show the applied-for mark in use in commerce in connection with any of the services specified in the statement of use. . . . Specifically, specimens appear to be an order and receipt for placing an advertisement, a receipt from the Maryland Department of Assessments and Taxation and a copy of a webpage. The order and payment for the advertisement, as well as the receipt from the Maryland Department of Assessments and Taxation do not advertise that the applicant is providing rental or management of apartments. Additionally, the printout of the applicant's webpage does not convey to consumers and potential consumers that the applicant is providing rental or leasing of apartments.

> An application based on Trademark Act Section 1(a) must include a specimen, showing the applied-for mark in use in commerce for each international class of goods and/or services identified in the statement of use. 15 U.S.C. §1051(a)(1); . . . .

> Examples of specimens for services include advertising and marketing materials, brochures, photographs of business signage and billboards, and webpages that show the mark used in the actual sale, rendering, or advertising of the services. . . . Specimens comprising advertising and promotional materials must show a direct association between the mark and the services.

Gunther Land did not pursue its attempts to register "The National Apartments at Brewers Hill," and its ITU Registration for that mark was abandoned. ECF 47-10 at 4-5; *see also* ECF 30, ¶ 6. However, Gunther Land disputed the USPTO's rejection of its SOU with respect to "The National Apartments" mark. ECF 47-10 at 4-8.

On August 16, 2017, counsel for Gunther Land filed a "Response to Office Action." Counsel stated, in pertinent part, *id*. at 4-5:

> In light of the following comments, Applicant respectfully submits that the previously submitted specimens properly show use of the Mark in commerce, and thus respectfully requests the Examining Attorney's reconsideration of such specimens and the refusal to register.

First, Applicant notes that the one-page document titled "The National Apartments," which is a screen print from the Applicant's webpage that includes a photograph of an apartment building immediately under the prominent display of the mark . . . is clear evidence of use of the mark in commerce to promote the services described in the Statement of Use. . . . As stated in 37 C.F.R. §2.56(b)(2), "[a] service mark specimen must show the mark as actually used in the sale or advertising of the services." The specimen described above prominently displays the mark being used to promote an apartment building. Any consumer viewing such webpage would recognize that the website page promotes apartments available for rent, and thus at least "rental of apartments," "rental of apartments in an apartment community," and "renting of apartments" all as set forth in the description of services. . . . Here, the referenced specimen provides an image of an apartment building, thus identifying to any ordinary, reasonable consumer at least rental and leasing of apartments as the services being offered, and distinguishing them from the services of others through prominent display of the Mark on the page. Such display of the Mark and of the apartment building on a webpage create a direct association between the Mark and the services described above, and use the Mark in such a way as to identify and distinguish the serves and their source, and is thus a sufficient specimen of use of the Mark. . . .

Thereafter, on October 17, 2017, the USPTO reversed its decision and accepted Gunther Land's SOU, permitting registration of "The National Apartments" (Registration Number 5,312,038) on the Principal Register. ECF 47-9 at 28 (the "Registration").

### D.    OCRE's Cease-and-Desist Demand

David Knipp, an OCRE employee, recalled that sometime in 2009, he saw a sign posted outside of JFY's Dillon Street Property, marketing the building as "The National." ECF 47-31 (Knipp Deposition) at 3, p. 18. But, at that time, the Obrecht Parties did not contact JFY to object to its use of "The National." *Id.*

In April 2016, Knipp wrote to Penner about JFY's use of "The National," as OCRE planned to use "The National Apartments" for the Project. In an email to Penner of April 6, 2016 (ECF 69-16), Knipp stated:

It's nice to see progress across the street, David, and I already have crane envy. I'm concerned, though, that we both seem to be using the same name for our projects – The National Apartments. We plan to break ground within a year on another 375 units on the parcel to the east of Hanover Brewers Hill for which we have already

registered the web domain and trademarked the name. Is there any chance you'd consider a different name?

Penner and Knipp met in the summer of 2016 to discuss the projects. ECF 47-1, ¶ 11. JFY did not object to OCRE's use of the name. *Id.* ¶ 12. But, as Penner put it, "it didn't make sense" for JFY to change the name of the Dillon Street Property because it "had been permitted" to use "'The National' for the past ten years[.]" *Id.*

In a letter of January 20, 2017, titled "Improper Use of Obrecht Commercial Real Estate Inc. Mark," counsel for OCRE sent a cease-and-desist demand to JFY. ECF 47-12 at 2-4. Counsel stated, in relevant part, *id.* (emphasis in original):

> As you know, OCRE engages in the development, management and leasing of multifamily apartment projects, focusing its efforts in the Brewers Hill neighborhood of Baltimore City, MD. It has used the service mark "The National Apartments" and "The National Apartments at Brewers Hill", and variations thereof (collectively, the "Marks") for nearly a decade to promote these services. . . .

> The Marks are synonymous with the high quality products and services provided by OCRE in the Brewers Hill development, and are considered by OCRE to be a critical intellectual property asset. The Marks are protected by a broad array of strong federal and state common and statutory laws. These rights provide OCRE with the exclusive right to use the Marks in connection with the management, leasing and rental of multifamily apartments and to prevent uses that are likely to cause confusion in the marketplace.

> It is our understanding that [JFY] has been using the Marks to promote its multifamily apartment building currently under construction at the intersection of Dean and Dillon Streets in Baltimore City, MD, which is directly across the street from OCRE's Brewers Hill development. In this regard, OCRE is aware that JFY has used the name "The National" on the apartments.com website as well as on the Urban Design Group website, among other places. JFY's improper use of the Marks is likely to create the false impression that it is associated with OCRE and the Brewers Hill Development allowing it to trade on OCRE's goodwill and stellar business reputation. By using "The National", JFY is intentionally creating confusion in the marketplace and illegally piggybacking on OCRE's protected Marks and brand that OCRE has carefully cultivated for over 15 years.

> JFY's unauthorized use of OCRE's intellectual property is likely to cause confusion in the marketplace and thus constitutes a violation of various provisions

of the federal Trademark Act of 1946, as amended (15 U.S.C. § 1051 *et seq.*) (the "Lanham Act"), as well as a misappropriation actionable under applicable federal and state trade regulation laws prohibiting unfair and deceptive trade and advertising practices. Consequently, pursuant to the sanctions available to an aggrieved party pursuant to those laws, JFY's unauthorized use of OCRE's intellectual property could result in a civil action to recover money damages, the projects generated by JFY's improper use, and the costs incurred with prosecuting any such matter. . . .

**IN LIGHT OF THE FOREGOING, BE ADVISED THAT THIS LETTER SERVES AS A FORMAL AND IMMEDIATE DEMAND TO CEASE AND DESIST USE OF ANY MARKETING MATERIAL OR OTHER COMMUNICATION OR ACTIVITY, IN ANY MEDIUM WHATSOEVER, INCLUDING PARTICIPATING IN THE APARTMENTS.COM PROGRAM, WHICH CONTAINS OCRE'S INTELLECTUAL PROPERTY, INCLUDING THE MARKS. <u>YOU ARE HEREBY INSTRUCTED TO CERTIFY TO US IN WRITING WITHIN SEVEN (7) DAYS OF THE DATE OF THIS LETTER THAT SUCH ACTIVITIES HAVE CEASED AND THAT YOU WILL NOT ENGAGE IN ANY SUCH ACTIVITIES AT ANY TIME WHATSOEVER IN THE FUTURE.</u>**

Although OCRE wishes to resolve this matter in an amicable fashion, please be advised that OCRE has developed, enhanced and marketed the Marks at great expense and will use all of its resources to protect its rights and interests in its intellectual property assets, including initiating litigation. . . .

In a letter dated February 27, 2017 (ECF 47-13), counsel for JFY responded that OCRE was not the owner of the ITU Registrations and other claimed intellectual property assets, as represented by OCRE. Counsel stated, in pertinent part, *id*. at 2-3:

My client takes third party intellectual property rights seriously and respects them, and hopes that others respects its intellectual property rights. We have performed preliminary research into this matter and for the reasons stated herein, we have found that my client is not using any word, slogan or image, such as "The National" in a trademark manner nor does it intend to in the future. My client also does not associate it with any goods or services that are being used in commerce. Indeed, it is only a name that will be on a building and is merely a geographical description that describes where the building is located, which is at the old National Brewery Warehouse. . . .

Your client does not appear to own, and appears to lack exclusive use of, the marks referenced in your Letter, which is necessary for it to assert trademark rights against my client. Your Letter states that OCRE owns and uses certain marks

related to "The National Apartments" and "The National Apartments at Brewers Hill," including URLs, federally registered trademarks and common law marks. We looked in the various registrars and registrations that your Letter cites and found that an individual owns the URLs referenced in your Letter and another entity owns the federally registered marks. Indeed, we found that OCRE does not own any of the registrations nor is my client aware of any use by OCRE of such marks so we can only assume the veracity of the comments in your Letter concerning OCRE's ownership and exclusive use of such marks. . . . Multiple parties using a mark belie any notion that your client owns or has an exclusive right to use the referenced marks in your letter . . . .

Assuming that my client is using "The National" in a trademark manner, my client's first use of its mark is well before your client's first use of its marks. Enclosed, please find various documents that my client discovered from an initial and brief search of its records that clearly indicate that my client has been using the term "The National" in commerce for the name of its apartment building, and to use your argument, leasing services, since as early as 2005. . . .

Continuing the assumption that my client is using its mark in a trademark manner, there is no confusion in the marketplace. My understanding is that your client will not complete its building for many more months, and therefore, there is no actual confusion in the marketplace, but rather speculation by your client. Your client also has rights to service marks, if anything, in the fields of real estate management and leasing services. JFY has not used nor does it intend on using "The National" in connection with these services. If you have evidence otherwise of such use, please provide samples of this to us.

\* \* \*

Your Letter also suggests that JFY has intentionally unfairly competed with your client in the marketplace. Inasmuch as the building under construction by JFY has not been completed, as your Letter acknowledges, and furthermore as it is my understanding that your client's building will not be completed for years, there has been no unfair competition and we do not read your Letter as making such a representation as fact. . . .

Through counsel, OCRE replied in a letter of March 9, 2017 (ECF 47-14). First, counsel noted that "Gunther Land intends on assigning" the ITU Registrations "and their associated rights to OCRE in the very near term." *Id*. at 2. In addition, he stated, in pertinent part, *id*. at 2-3:

Second, your assertion that JFY's use of the marks does not constitute "trademark use" is simply incorrect. Using a name or word to advertise or promote *any* goods or services constitutes "trademark use" within the scope of the Lanham Act. By promoting the building with the marks "The National Apartments," "The

20

National Apartments at Brewers Hill," or some other similar name, and then marking the sale or lease of units within that building, JFY is engaging in impermissible use of those marks. Indeed, this is the exact same manner of use in which our client has been using, and intends on continuing to use, the marks; use which has been approved by the USPTO.

Third, your assertion that because no actual confusion has yet to occur that our client's concerns are premature or speculative is also without merit. As I am sure you know, actual confusion need not be established to prove trademark infringement. Rather, the question is whether a likelihood of confusion exists. Here, given the similarity of the names, the geographic proximity of the buildings, and the identical goods and services offered pursuant to those names, confusion is inevitable. Indeed, our client has received calls from individuals inquiring about the relationship between the two projects. This confusion is likely to grow as both projects near completion.

Finally, the evidence included with your letter regarding JFY's alleged use prior to November 2015 is not persuasive. Entering into agreements with local governmental entities and labeling drawings with the name of the building, is not use in interstate commerce providing any trademark rights to JFY. If this were the case, our client's first use would date back many years as well. As a result of its application to the USPTO, our client's rights date back to at least November 18, 2015. It is our understanding that this pre-dates any actual use in interstate commerce by JFY. . . .

On March 16, 2017, a few months after the above exchange, JFY filed suit. *See* ECF 1.

Additional facts are included, *infra*.

## II.    Legal Standard

Both sides have moved for summary judgment under Fed. R. Civ. P. 56. Under Rule 56(a),

summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848

F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence

in the light most favorable to the non-moving party, the case presents no genuine issues of material

fact and the moving party demonstrates entitlement to judgment as a matter of law."). To preclude

the award of summary judgment, the nonmoving party must demonstrate that there are disputes of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Merely because both sides have moved for summary judgment, this does not mean that summary judgment to one party or another is necessarily appropriate. If there is a genuine issue of material fact, both motions must be denied. *See* 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.). Moreover, the Court is mindful of "'the intensely factual nature of trademark disputes,'" which generally disfavor summary judgment. *American Automobile Ass'n of No. Cal. v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1088 (N.D. Cal.) (citation omitted).

### III. Discussion

JFY moves for summary judgment with respect to all three counts of the Obrecht Parties' Counterclaim. It also seeks summary judgment as to Count III of its Amended Complaint, in which plaintiff seeks to cancel Gunther Land's registration of "The National Apartments." ECF 46. In their cross motion, the Obrecht Parties seek summary judgment as to all counts that they lodged against JFY in their Counterclaim and all counts asserted against them by JFY in the Amended Complaint. ECF 52. Each side advances numerous contentions.[15]

JFY contends, *inter alia*, that the Obrecht Parties cannot show a bona fide use in commerce of "The National" or "The National Apartments" so as to entitle them to service mark protection. ECF 46-2 at 3. Further, JFY contends that the mark lacks distinctiveness and has not achieved the required secondary meaning. *Id.* Further, it maintains that the name of JFY's building does not create a likelihood of confusion. *Id.*[16]

Conversely, the Obrecht Parties insist, among other things, that JFY has infringed on their valid trademark. Further, they claim that they have used the "NATIONAL" mark, or a derivate, continuously since at least 2001. ECF 52-1 at 17, 19-20. But, the Obrechts do not contend that they used the "National Apartments" mark before November 2015. ECF 52-1 at 19 n.16. They explain that they did not file an "in-use application" and "[f]or that reason" they filed an ITU application. *Id.* Nevertheless, they contend that this "does not diminish" their "*bona fide* use for many years of the marks NATIONAL, NATIONAL EAST, and NATTY BOH . . . ." *Id.* Moreover, they argue that JFY's use of "The National" has caused actual confusion in the

---

[15] The Obrecht Entities did not specifically Counts I and II of JFY's Amended Complaint. *See* ECF 52-1; ECF 69.

[16] JFY has assumed that the Obrecht Parties are not relying on trademark registration in regard to their infringement claim. ECF 46-2 at 15 n.22. JFY is mistaken.

marketplace.  *Id.* at 22.

### A.    Trademark Infringement And Unfair Competition

Count 1 of the Amended Complaint seeks declaratory relief.  In Count II of the Amended Complaint, and in Count I of the Counterclaim, the parties assert competing claims of trademark infringement under Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a).  Count III of the Counterclaim lodges a claim of unfair competition under State law.  ECF 13, ¶¶ 29-43.  Count III of the Amended Complaint seeks cancellation of Gunther Land's registration of The National Apartments trademark.  As noted, JFY seeks summary judgment as to all of the claims in the counterclaim, but only as to Count III of its Amended Complaint.  The Obrecht Entities seek summary judgment as to all of their own claims and as to all claims asserted by JFY.

### 1.

A "trademark" is "a designation used 'to identify and distinguish' the goods of a person," and a "service mark" is a designation to identify and distinguish the services of a person. 3 THOMAS MCCARTHY, *McCarthy on Trademarks and Unfair Competition* § 3:1.  The term "mark" includes any trademark or service mark.  15 U.S.C. § 1127.  The Lanham Act (the "Act") defines "person" as "a juristic person as well as a natural person," and defines "juristic person" to "include[] a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law."  *Id.*

The Act, also known as the Trademark Registration Act of 1946, 60 Stat. 427, as amended, 15 U.S.C. §§ 1051 *et seq.*, was "adopted to establish consistent nationwide protection for trademarks by creating a system of registration, by instituting safeguards for those trademarks registered for a period of time, and by setting forth an administrative process for infringement actions."  *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 9 F.3d 1091, 1094 (4th Cir. 1993) (citing

*Park 'N' Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193 (1985)).  The Act "provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers."  *Park 'N Fly, Inc.*, 469 U.S. at 198.  Further, the Act is intended, *inter alia*, to "regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce" and to thereby "protect persons engaged in such commerce against unfair competition."  15 U.S.C. § 1127.

Section 32, codified at 15 U.S.C. § 1114, and Section 43(a), codified at 15 U.S.C. § 1125(a), prohibit trademark infringement and serve "to protect consumers from confusion in the marketplace."  *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 321 (4th Cir. 2015) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162-64 (1995)).  The Fourth Circuit has explained: "Trademarks designate the source or affiliation of goods and services in order to provide consumers with information about those goods and services," and to "allow[] mark holders to build and benefit from the reputation of their brands."  *Radiance Found.*, 786 F.3d at 321.  To this end, trademark infringement law "serves the important functions of protecting product identification, providing consumer information, and encouraging the production of quality goods and services."  *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005).

The marks "enable consumers to make informed, independent decisions about quality and other product characteristics."  *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 339 (4th Cir. 2009).  On the other hand, there is no entitlement to "an exclusive interest in words that do not identify goodwill attached to products or product sources but rather are used for their common meaning . . ."  *Id.*

Section 43(a)(a) of the Act, 15 U.S.C. § 1125(a), authorizes a civil action against

26

Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which — (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

The Fourth Circuit has construed Section 43(a) "to protect against trademark, service mark, and trade name infringement" even where the mark "has not been federally registered." *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). Although "much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, [§ 1125(a)] goes beyond trademark protection.'" *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28-29 (2003)).

"The standards for asserting Lanham Act claims for trademark infringement and unfair competition based on the inappropriate use of a mark are largely the same." *Potomac Conference Corp. of Seventh-day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, 2 F. Supp. 3d 758, 768 (D. Md. 2014); *see also JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 327 (D. Md. 2017). Indeed, the "test for trademark infringement and unfair competition under [Maryland] law is the same as the test under the Lanham Act." *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460 (D. Md. 2002), *aff'd*, 91 F. App'x 880 (4th Cir. 2004); *see Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 422 (4th Cir. 1998); *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 597 (4th Cir. 1992); *see also JFJ Toys*, 237 F. Supp. 3d at 327-40 (analyzing trademark infringement and unfair competition claims under the Lanham Act and Maryland common law); *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 659 (D. Md. 2013). Therefore, these claims may be considered collectively.

To establish a claim of trademark infringement under the Act, a plaintiff must prove:

> (1) that it possesses a [valid] mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred "in commerce"; (4) that the [opposing party] used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers.

*Lamparello*, 420 F.3d at 313 (quoting *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125 and *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va.*, 43 F.3d 922, 930 (4th Cir. 1995)) (alterations in *Lamparello*); *accord Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012); *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 547 (D. Md. 2014).

The Fourth Circuit has said that "'to demonstrate trademark infringement under the Lanham Act, a plaintiff must prove, first, that it owns a valid and protectable mark, and, second, that the defendant's use of . . . that mark creates a likelihood of confusion.'" *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017) (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006); *see George & Co. LLC v. Imagination Entert. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009); *Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001); *see also Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202-03 (9th Cir. 2012).

There are four categories of trademarks, in "declining order of distinctiveness." *OBX-Stock, Inc.*, 558 F.3d at 340. They are: 1) arbitrary or fanciful; 2) suggestive; 3) descriptive; 4) generic. *See Grayson O Co.*, 856 F.3d at 315; *see also Retail Servs., Inc. v. Freebies Publ's*, 364 F.3d 535, 538-39 (4th Cir. 2004), *abrogated on other grounds by Verisign, Inc. v. XYZ.COM LLC*, 891 F.3d 481 (4th Cir. 2018); *JFJ Toys, Inc.*, 237 F. Supp. 3d at 328. Arbitrary, fanciful, and suggestive marks are "inherently distinctive and thus merit the highest protection; whereas generic marks do not merit any trademark protection." *JFJ Toys, Inc.*, 237 F. Supp. 3d at 328; *see US*

*Search, LLC v. U.S. Search.com Inc.*, 300 F. 3d 517, 523 (4th Cir. 2002); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996).

Arbitrary marks are "based on existing words used in ways unconnected with their common meaning . . . ." *OBX-Stock, Inc.*, 558 F.3d at 340. Fanciful marks "are usually nonsense words expressly coined to serve as a trademark . . . ." *JFJ Toys, Inc.*, 237 F. Supp. 3d at 328. Suggestive marks "connote . . . some quality, ingredient, or characteristic of the product . . . ." *Sara Lee Corp.*, 81 F.3d at 464. Descriptive marks generally "describe a function, use, characteristic, size, or intended purpose" and are protected only if they have acquired a "secondary meaning." *Freebies*, 364 F.3d at 539. "Secondary meaning exists when, in the minds of the public, the primary significance of the term identifies the source of the product rather than the product itself." *JFJ Toys, Inc.*, 237 F. Supp. 3d at 328; *see OBX-Stock, Inc.*, 558 F.3d at 341. Notably, a "generic mark merely employs the common name of a product or service [and] is ineligible for trademark protection." *Endo Surg Med. Inc. v. Endo Master Med., Inc.*, 71 F. Supp. 3d 525, 547 (D. Md. 2014); *see also OBX-Stock, Inc.*, 558 F.3d at 340; *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F. 3d 137, 140 (4th Cir. 2000).

## 2.

As noted, to establish a claim of trademark infringement, a party must "first and most fundamentally prove that it has a valid and protectable mark." *U.S. Search, LLC*, 300 F.3d at 523 (citing *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001)); *see also Resorts of Pinehurst*, 148 F.3d at 421; *Putt-Putt, LLC*, 936 F. Supp. 2d at 653.

"[T]he standard test of ownership is priority of use." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996); *see also American Auto. Ass'n of No. Calif. v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1088 (N.D. Cal. 2019). Indeed, it is a "fundamental tenet of

trademark law . . . that ownership of an inherently distinctive mark . . . is governed by priority of use." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). Thus, "the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd.*, 96 F.3d at 1219. However, there must be "bona fide use of a mark in the ordinary course of trade . . . ." 15 U.S.C. § 1127. It is not enough "'merely to reserve a mark.'" *Brookfield Communications, Inc.*, 174 F.3d at 1051 (citing 15 U.S.C. § 1127). A mark is "deemed to be used in commerce . . . on services when it is used or displayed in the sale or advertising of services . . . rendered in commerce." 15 U.S.C. § 1127.

Federal registration "'confers important legal rights and benefits on trademark owners who register their marks.'" *Matal v. Tam*, ___ U.S. ____, 137 S. Ct. 1744, 1753 (2017) (quoting *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. ___, 135 S. Ct. 1293, 1317 (2015)). When the USPTO issues a certificate of registration, that registration becomes *prima facie* evidence of: (1) the "validity" of the mark and its registration; (2) "the registrant's ownership of the mark"; and (3) "the registrant's exclusive right" to use the mark "in commerce on or in connection with the goods and services" specified in the certificate of registration. 15 U.S.C. § 1115(a); *see also OBX-Stock, Inc.*, 558 F.3d at 342; *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001); *Potomac Conference*, 2 F. Supp. 3d at 768-69; *Putt-Putt*, 936 F. Supp. 2d at 653-54. In other words, a trademark registered with the USPTO "is presumptively valid." *Teal Bay Alliances, LLC v. Southbound One, Inc.*, MJG-13-2180, 2015 WL 401251, at *8 (D. Md. Jan. 26, 2015). Thus, despite the commonality of the word "National," registration gives rise to a rebuttable presumption that the term is not generic. *JFJ Toys, Inc.*, 237 F. Supp. 3d at 329.

A certificate of registration provides "a significant procedural advantage for the registrant." *Freebies, Publ'g*, 364 F.3d at 538. Indeed, "[w]ithout a certificate of registration, the owner would

be required to establish that the disputed mark was sufficiently distinctive to warrant trademark protection in the first place." *Id*. (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984)).

Of relevance here, 15 U.S.C. § 1051(b) permits the filing of an application for registration on the Principal Register by an applicant with a "bona fide intention" to use the mark on the specified goods or services. *See* 3 MCCARTHY § 19:13. This is referred to as an intent to use or "ITU" application for registration. *Id*. In an ITU application, "the drawing of the mark must be a substantially exact representation of the mark as intended to be used on or in connection with the goods and/or services specified in the application[.]" 37 C.F.R. § 2.51(b). Unless "registration is successfully opposed," the USPTO shall issue "a notice of allowance" to the applicant. 15 U.S.C. § 1063(b)(2).

Within six months following the USPTO's issuance of the notice of allowance under § 1063(b)(2), the applicant must file a statement of use or "SOU," along with specimens. 15 U.S.C. § 1051(a); *see also* 3 MCCARTHY § 19:13.[17] "A trademark specimen is a label, tag, or container for the goods, or a display associated with the goods." 37 C.F.R. § 2.56(b)(1); *see also Teal Bay Alliances, LLC*, MJG-13-2180, 2015 WL 401251, at *8 (citing 37 C.F.R. § 2.56(b)(1)). "A photocopy or other reproduction of a specimen of the mark as actually used on or in connection with the goods, or in the sale or advertising of the services, is acceptable." 37 C.F.R. § 2.56(c).

The SOU must verify, *inter alia*, that "the mark is in use in commerce and specify[] the date of the applicant's first use of the mark in commerce . . . ." 15 U.S.C. § 1051(d). As indicated,

---

[17] Under 15 U.S.C. § 1051(d)(4), "failure to timely file a verified" SOU, pursuant to 10 U.S.C. § 1051(d)(2), or an extension request, pursuant to 10 U.S.C. § 1051(d)(2), "shall result in abandonment of the application, unless it can be shown . . . that the delay in responding was unintentional[.]"

15 U.S.C. § 1127 defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Notably, a mark is "deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce[.]" *Id.*

Once the application is submitted to the USPTO, an Attorney Examiner of the USPTO examines the application "to see if any of the statutory bars to registration apply to the applicant's mark." 3 McCarthy § 19.124.50; *see also* 15 U.S.C. §§ 1051(d), 1052. After the examination is completed, the Attorney Examiner issues an "Official Action," accepting or rejecting the application in whole or in part. 3 McCarthy § 19.124.50. If the application is rejected, the applicant "may respond with argument to try to convince the examiner otherwise." *Id.* If the application is accepted, the USPTO shall register the mark and issue a "certificate of registration" for the "goods or services recited" in the SOU, and "notice of registration shall be published in the Official Gazette" of the USPTO. 15 U.S.C. § 1051(d).

However, and of relevance here, "'the registration is not absolute [and is] subject to rebuttal.'" *Retail Servs.*, 364 F.3d at 542 (quoting *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002)). Therefore, an opposing party "can still challenge a mark registered on the Principal Register because registration 'shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.'" *JFJ Toys, Inc.*, 237 F. Supp. 3d at 329 (quoting 15 U.S.C. § 115(a)).

Notably, the "presumption of validity" of a registered mark "has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence" to rebut the presumption of validity of the registration "by a preponderance of evidence." *Retail Servs.*, 364 F.3d at 542 (citations omitted); *see also JFJ Toys, Inc.*, 237 F. Supp. 3d at 329. However, "entry

on the Principal Register does not shift the burden of persuasion on validity, merely the burden of production." *OBX-Stock, Inc.*, 558 F.3d at 342 (citing *Retail Servs.*, 364 F.3d at 542).

**3.**

The Obrecht Parties argue, *inter alia*, that their mark falls into the "arbitrary" class, and that the mark is "strong." ECF 52-1 at 24. Therefore, they maintain that no secondary meaning is required to establish the validity of the mark. *Id.* Regardless, the Obrechts claim that secondary meaning "is obvious from the record." *Id.*

JFY vigorously disagrees, on both fronts. According to JFY, "'The National' is not now and has never been distinctive . . . ." ECF 46-2 at 20. JFY insists that the mark is not valid. *See* ECF 61 at 23. Therefore, it maintains that proof of secondary meaning in the marketplace is necessary in order for the mark to be eligible for protection, but has not been established.

The parties also dispute whether either party actually used the mark at issue in commerce and in connection with the sale of goods, and whether there is a likelihood of confusion of consumers. Further, the parties contest which entity first used the term "National."

On July 5, 2016, the USPTO approved Gunther Land's ITU Applications in connection with "The National Apartments" and "The National Apartments at Brewers Hill." ECF 47-9 at 8. Six months later, Gunther Land filed SOUs with the USPTO to request the registration of the two marks. ECF 47-9 at 21-27. According to the SOU, November 18, 2015, was the "First Use in Commerce Date" with respect to "The National Apartments." *Id.* In support of the SOUs, Gunther Land submitted, among other things, a copy of a rendering of the apartment building, with the title "THE NATIONAL APARTMENTS" and, underneath that title, "website coming soon." *Id.* at 21. The rendering depicts "The National" on the building. *Id.*; *see* Appendix.

As noted, the USPTO initially rejected Gunther Land's SOUs. *Id.* at 23-25. With respect

to "The National Apartments" mark, the USPTO Examining Attorney explained that the specimen submitted did "not show the applied-for mark in use in commerce in connection with any of the services specified in the statement of use."  *Id.* at 24.  In response to the USPTO's decision, Gunther Land abandoned its ITU registration of "The National Apartments at Brewers Hill."  But, it challenged the USPTO's rejection of "The National Apartments" mark.  ECF 47-10 at 4-8.

In the meantime, JFY filed this suit on June 16, 2017.  ECF 1.  And, the Obrecht Parties responded to the suit on July 28, 2017, filing both an Answer and a Counterclaim.  ECF 12; ECF 13.  Months after suit was filed, on October 17, 2017, the USPTO approved Gunther Land's SOU, permitting registration of "The National Apartments."  ECF 47-9 at 28.  On January 12, 2018, JFY amended its suit to include, *inter alia*, the USPTO's approval of the registration.  ECF 30, ¶ 7.[18]

Gunther Land's registration of "The National Apartments" with the USPTO frames the Court's analysis.  *See JFJ Toys*, 237 F. Supp. 3d at 330.  Based on the foregoing record, the Obrecht Parties have established that they registered "The National Apartments" on the Principal Register of the USPTO.  And, the USPTO will not register a mark that it determines is generic.  *Nat'l Fed'n of the Blind, Inc. v. Loompanics Enterprises, Inc.*, 936 F. Supp. 1232, 1247 (D. Md. 1996).  Therefore, a registered mark is presumed to be at least descriptive with a secondary meaning.  *Id.*

Accordingly, the registration here serves as *prima facie* evidence of the mark's validity,

---

[18] Curiously, the Obrecht Parties did not amend their Counterclaim to include the USPTO's acceptance of "The National Apartments" on the principal register.  *See* ECF 13.  In footnotes, JFY argues that the Court should not consider the registration on summary judgment.  ECF 46-2 at 15 n.22; ECF 61 at 21, n.15.  It contends that, based on allegations in the Counterclaim, "the Obrecht Parties are not relying on any trademark registration certificate in asserting [their] claim for infringement under [15 U.S.C. §] 1125(a)."  ECF 46-2 at 15, n.22.

JFY cites no case law in support of this contention.  In any event, JFY does not dispute that the USPTO accepted Gunther Land's registration, which JFY attached as an exhibit to its own motion for partial summary judgment.  *See* ECF 47-9 at 28.  Therefore, I shall consider the registration as evidence.

Gunther Land's ownership of the mark, and Gunther Land's exclusive right to use the mark. 15 U.S.C. § 1115(a); *see also Resorts of Pinehurst*, 148 F.3d at 422. Therefore, the Obrecht Parties are "entitled by law to the rebuttable presumption" that the mark is valid and that they have the exclusive right to use the mark. *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 172 (4th Cir. 2006).

As indicated, registration "and the presumption it creates" merely shift the burden of production from the Obrecht Parties to JFY. Therefore, JFY "must introduce sufficient evidence" to rebut the presumption of the Obrecht Parties' right to such exclusive use. *Pizzeria Uno*, 747 F.2d at 1529 ; *see also JFJ Toys*, 237 F. Supp. 3d at 330; *Nat'l Fed'n of the Blind, Inc.*, 936 F. Supp. at 1247.

**4.**

The Obrecht Parties assert that their "ownership" of the mark "was secured as a result of their continuous use, since at least 2001, of marks prominently featuring" the word "National" or a derivate, such as "National East" and "Natty Boh Tower." ECF 52-1 at 19. Moreover, they contend that their "use of NATIONAL in connection with the various developments within the Brewers Hill PUD provides them with 'both the right to use [NATIONAL] and the right to prevent others from using the same *or [a] confusingly similar mark*.'" *Id.* (quoting *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 267 (4th Cir. 2003)) (emphasis added by the Obrechts). Further, the Obrecht Parties argue that the marketing of the Project "demonstrate[s] continued and consistent use of the National mark." ECF 69 at 22. JFY contends that there is "no evidence" that the Obrecht Entities satisfy the requirement of "use in commerce," as set forth in 15 U.S.C. § 1127. ECF 46-2 at 15-16.

As explained, the Act defines "use in commerce" as "the bona fide use of a mark in the

ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. The Act provides that a mark is "deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . and the person rendering the services is engaged in commerce in connection with the services." *Id*.

The conjunctive use of the word "and" indicates that "there are two essential elements that must be present to constitute 'use in commerce'" for purposes of the Act: (1) "advertising that employs the mark and (2) the rendering of services to which the mark attaches." *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 383 (4th Cir. 2003). The Fourth Circuit has emphasized: "*Both* elements are required, and *both* elements must be distinctively analyzed." *Id*. at 373 (emphasis in original).

To be sure, "[i]t is a 'bedrock principle[] of trademark law' that trademark ownership 'is not acquired by federal or state registration,' but rather 'from prior appropriation and actual use in the market.'" *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016) (quoting *Allard Enters, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 256 (6th Cir. 1998)). To this end, "mere token use" of a mark does not "constitute 'use' under the Lanham Act." *Emergency One*, 228 F.3d at 536. The Fourth Circuit has observed: "Because a mark is used in commerce only if it accompanies services rendered in commerce, *i.e.*, it is employed appurtenant to an established business or trade that is in commerce, 'mere advertising' of that mark does not establish its protectability, though advertising is itself commerce that Congress may regulate." *Int'l Bancorp*, 329 F.3d at 364.

Indeed, "'[t]o acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to

actually use the mark in the sale of goods or services.'" *Emergency One*, 332 F.3d at 267 (quoting *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)); *see also Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006) ("Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark.").  As the parties seeking to establish appropriation of a trademark, the Obrecht Entities "must show first, adoption, and second, 'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [the adopter of the mark].'" *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433-34 (7th Cir. 1999) (citation omitted); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999).[19]

The issue of infringement is "an inherently factual issue that depends on the facts and circumstances in each case."  *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 933 (internal quotation marks omitted); *see Rosetta Stone, Ltd.*, 676 F.3d at 153.  The Obrecht Parties argue that they "have acquired trademark rights to the National mark based on a totality of the following," ECF 69 at 11:

> (1) Naming certain buildings within the PUD National East, Natty Boh Tower, and National Apartments;
>
> (2) Acquiring and using domain names, including the nationalapartments.com, nationalbrewershill.com, and thenationalapts.com, to market certain properties within the PUD;

---

[19] Under common law, "the 'use' required to establish trademark ownership" in the absence of registration "is not the same as the 'use' required to register" a mark.  *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 986 F. Supp. 253, 258 (D. Del. 1997) (citing *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) ("[U]se sufficient to register a mark that soon is widely distributed is not necessarily enough to acquire rights in the absence of registration.")).  Notably, "[t]he 'use' that satisfies the registration requirement may not be sufficient 'if [the] owner seeks to use the mark to stifle the efforts of others.'"  *Lucent Info.*, 986 F. Supp. at 259 (quoting *Talk to Me Products, Inc. v. Larami Corp.*, 804 F. Supp. 555, 561 (S.D.N.Y. 1992)) (alteration in *Lucent Info.*).

(3) Prominently displaying the National mark on certain structures, including the iconic Dillon Street Bridge, as well as the Grain Building and Natty Boh Tower;

(4) Using the National mark in radio commercials and third party leasing websites, including CoStar, Kettler, CubeSmart, apartments.com, ForRent.com, CommercialCafe.com, and LoopNet;

(5) Preserving and showcasing National Brewing Company artifacts throughout the PUD; and

(6) Registering THE NATIONAL APARTMENTS mark with the [USPTO].

In sum, the evidence presented by the Obrecht Parties falls into two categories: (1) use of the word "National" or a derivate, such as "National East" or "Natty Boh Tower"; and (2) the marketing, advertising, and branding campaign, including for "The National Apartments" building.

The Obrechts maintain that for nearly two decades they have promoted a National Brewery theme, using the words "National" or "Natty" in various forms. Beginning in 2001, they marketed the leasing of commercial space in the "National East" building and the "Natty Boh Tower." Beginning in late 2001, CB Richard Ellis Group, Inc., now known as CBRE Group, Inc. ("CBRE"), was the exclusive listing agent for all Commercial Space" within the PUD. *See* ECF 52-14 (Declaration of Gail Chrzan), ¶ 6.[20]

Gail Chrzan worked for CBRE for almost 33 years, representing tenants and landlords in the leasing of commercial real estate. *Id.* ¶ 5. She avers that the "term 'National' was prominently featured throughout" the PUD. *Id.* ¶ 8. And, she always referred to the building at 3600 O'Donnell

---

[20] JFY objects to the Court's consideration of Gail Chrzan's Declaration (ECF 52-14), claiming Chrzan "seeks to offer expert opinions despite OBRECHT objecting to identifying experts as premature, and despite the declaration on its face failing to comply with the requirements of Fed. R. Ev. 702 concerning the foundation for her opinions." ECF 61 at 14. The Declaration is largely factual and may be considered for the factual assertions it contains.

Street as the Natty Boh Tower when interacting with brokers, agents, and prospecting tenants.  *Id.*
¶ 9.  Similarly, she always referred to the building at 3700 O'Donnell Street as the National East
Building.  *Id.*

As noted, in 2005, the Obrecht Parties renovated a bridge on Dillon Street in the PUD,
bearing the words "THE NATIONAL BREWING Co."  ECF 52-14, ¶ 8; *see also* ECF 52-11 at 5
(Image of "THE NATIONAL BREWING Co." bridge); ECF 52-11 at 3 (Grain Building
displaying "National Brewing Company" signage); Appendix.  The Obrecht Parties have also
displayed several brewery artifacts inside the Natty Boh Tower, bearing the names "National
Brewery," "National Bohemian," and "National Beer."  ECF 52-12 (Natty Boh Tower Images);
*see also* Appendix.

In addition, a 2014 OCRE pamphlet marketed the properties as the "Natty East" building
and the "Natty Boh Tower."  ECF 52-16.  The brochure also featured a picture of the "Boh Man."
The brochure references three apartments complexes – Domain Brewers Hill, Hanover Brewers
Hill, and The Gunther.  However, the Obrecht name is not readily apparent.  *Id.*

A BALTIMORE SUN article dated October 8, 2015, titled "More development on the way in
Brewers Hill," referred to the development of the "National East" building and the "Natty Boh
Tower," and said, ECF 52-28:

> Obrecht Commercial Real Estate has been working on the redevelopment of the
> two adjacent former brewer complexes for about 15 years.  The [Obrecht Parties]
> and its partners already have built or converted 1.5 million square feet, including
> about 780 apartments. . . . In addition to the Gunther and Hanover Brewers Hill
> apartments, the site includes the National East Building and Natty Boh office
> buildings. . . . Brewers Hill, formerly an industrial area, has been transformed in
> the last decade with new projects, including Obrecht's, Canton Crossing and others.

Further, at his deposition, Mr. Obrecht stated that the Obrecht Entities promoted the
"National" mark in community meetings with several neighborhood associations.  ECF 52-3 at 11,

p. 55. During the meetings, they "would talk about the history of the breweries and how [they] were maintaining the historical integrity of the buildings and bringing them back to what they were, which was very popular in the communities." *Id*. at 12-13, pp. 57-58. Mr. Obrecht explained that the properties "would be labeled as National Brewery or National East or Natty Boh Tower through our signage, through our labelings, through our marketing brochures, through everything we produced, more or less." *Id*. at 13, p. 58.

The Obrecht Parties made varied use of the word "National," or a derivate, from a family of related marks, such as the National Brewing Company, National Bohemian, and Natty Boh. But, the Obrecht Parties did not use any consistent pattern or design to highlight "National." Their use of the word "National" in brochures, pamphlets, and signage varied significantly, in font size, color, and form. ECF 52-7; ECF 52-11; ECF 52-13. Indeed, the SOU expressly provides that "[t]he mark consists of standard characters, without claim to any particular font, style, size, or color." ECF 47-9 at 5. *See MicroStrategy Inc.*, 245 F.3d at 342 (finding that use of mark did not constitute trademark use when there was no use of a "'constant pattern,'" nor was the mark consistently placed "on a particular part of the page, or in a particular type, . . . or consistently used [with] a distinctive font, color, typeset or any other method that makes 'its nature and function readily apparent and recognizable without extended analysis'").

And, the use of word "National" is generally accompanied by another but varied word, *e.g.*, Bohemian, Boh, Brewery. Further, the Obrecht Parties often use "Natty" as a diminutive form of "National." For example, one of their most prominent buildings in the PUD is known as the "Natty Boh Tower," not the "National Boh Tower." ECF 52-7; ECF 52-13. Similarly, they often refer to the "National East" building as the "Natty East" Building. *Id*. But, the Obrecht name is not joined with the words cited above.

The Obrecht Parties insist that "Natty Boh and Gunther Land . . . have the exclusive right to use THE NATIONAL APARTMENTS . . . in at least the Baltimore, Maryland area." ECF 13, ¶ 30. But, as a result of the Obrecht Parties' varied use of the word "National," it is not entirely clear "'which mark to attach to the [service]." *Am. Auto. Assoc. of N. Cal.*, *Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1097 (N.D. Cal. 2019) (quoting *Nexsan Techs., Inc. v. EMC Corp.*, 260 F. Supp. 3d 68, 77 (D. Mass. 2017)). Moreover, their varied use of derivates of "National" diminishes "'the public's ability to associate a single mark' with the service . . . .'" *Am. Auto. Assoc. of N. Cal.*, 367 F. Supp. 3d at 1096 (quoting *Nexsan Techs., Inc.*, 260 F. Supp. 3d at 77 (finding the "use of the mark [was] insufficiently clear or repetitive" such that the "public's ability to associate a single mark with the tested goods" was diminished)); *see also Teal Bay Alliances*, 2015 WL 401251, at *11 ("Trademark usage is typically immediately evident. Usually, when viewed in context, if it is not immediately obvious that [an] ornamental design is being used as an indication of origin, then probably it is not.").

To prevail on a cause of action for trademark infringement, the Obrechts must demonstrate that they used the mark at issue, "The National Apartments," in commerce, and that their use preceded that of JFY. Other than the current Project, the Obrecht Parties point only to one instance in which they used "The National Apartments" mark. In 2008, the Obrecht Parties and Hanover began the development of an apartment building located in the PUD, which they initially planned to name "The National Apartments." ECF 52-3 at 17. But, they ultimately renamed, marketed, and leased the apartment building as "Porter Brewers Hill." *Id*. at 17-18. The naming of a project over ten years ago is insufficient to support a finding that "The National Apartments" mark was used in connection with apartment rental services. *See MicroStrategy Inc.*, 245 F.3d at 342 ("[A] designation is not likely to be perceived as a mark of origin unless it is repetitively used, as opposed

to only an occasional or isolated use.")

In addition, the Obrecht Parties' position that they have consistently used the mark for nearly two decades is inconsistent with their submission to the USPTO. As indicated, on November 18, 2015, Gunther Land filed the ITU Application (ECF 47-9 at 2-9) based on an *intent* to use the mark "The National Apartments," rather than preexisting use in commerce. Thereafter, on January 5, 2017, Gunther Land filed the SOU and represented that the mark's "First Use in Commerce Date" was November 18, 2015. *Id.* at 11.

Further, Green, the attorney for Gunther Land who filed the ITU Application and the SOU, initially testified that the Obrecht Parties did not use "The National Apartments" in commerce as of the time they filed the ITU Application on November 18, 2015. He stated, ECF 47-34 (Green Deposition) at 3, p. 36: "To my knowledge, at the time of the filing of the [ITU] application for The National Apartments, none of the Obrecht Parties entities were using the mark."

Green was also asked whether Gunther Land was using "The National Apartments" mark in commerce as of the date of the filing of the SOU on January 5, 2017. He responded, *id.* at 3, pp. 43-44: "I don't believe so." Moreover, Green was asked whether he was aware of Gunther Land using the mark as of the date of his deposition on June 27, 2018. *Id.* He responded, *id.*:

> They are using the mark – Gunther Land, LLC has not built an apartment building, so they are not actually owning, operating, leasing, managing an apartment building. They have plans to do that and so they are using the mark in connection with the to-be-built apartment building. A planned to-be-built apartment building.[21]

In sum, as to the first category, concerning use of the word "National," the Obrecht Parties

---

[21] As JFY concedes, later in Green's deposition, he attempted to retract his response, stating that the Obrecht Parties were "using" the mark as of January 5, 2017, and that his earlier testimony was a "misstatement." ECF 46-2 at 17-18 (citing ECF 47-35 at pp. 36-37, 63-64). However, neither JFY nor the Obrecht Entities submitted pages 63-64 of Green's deposition.

claim that their use dates at least to 2001. But, they made inconsistent and varied use of the word, which is insufficient to support a finding that they used "The National Apartments" mark in connection with real estate services. *See MicroStrategy, Inc.*, 245 F.3d at 343 (stating that "'[e]ven though a word, name, symbol . . . *may be used* in the sale or advertising of services or on or in connection with goods' it is not protectable as a trademark 'unless it is *used* as a mark.'") (citation omitted) (emphasis in *MicroStrategy, Inc.*).

The second category of evidence presented by the Obrecht Parties concerns their current marketing of "The National Apartments." They contend that this conduct amounts to trademark use of the "National mark." ECF 69 at 22. They posit that the "mere fact that the building is not yet completed does not alter the fact that the name is in fact in use." ECF 69 at 26 (citing *Rearden LLC.*, 683 F.3d 1206).

JFY notes that the specimen of defendants' use of the NATIONAL APARTMENTS mark, submitted with its trademark application, merely consisted of a screen shot from its website marketing the apartment building. But, it contends that no goods or services were available at that time, because the building had not yet been built. ECF 62 at 25-26. JFY asserts that, since the filing of the ITU Application on November 18, 2015, "there is no evidence" that the Obrecht Parties have used "the mark 'The National Apartments' in commerce in connection with services in a manner other than mere advertising designed to reserve rights in the mark." ECF 46-2 at 17. Further, JFY maintains that the "'mere advertising'" of "The National Apartments" mark "does not establish its protectability" as a trademark. ECF 46-2 at 16 (quoting *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 192 F. Supp. 2d 467, 479 (E.D. Va. 2002), *aff'd*, 329 F.3d 359, 383 (4th Cir. 2003)). In JFY's view, "there is no evidence from which the court may reasonably infer the date [the Obrecht Parties] will finish construction on its

43

apartment building, obtain a certificate of occupancy and begin the 'actual rendition of services' using its mark, such as leasing or property management services." ECF 61 at 20.

In response, the Obrecht Parties contend that JFY "overlooks the well-established doctrine that trademark owners often use a mark to generate interest in a good or service before that good or service is actually available." ECF 52-1 at 18 (citing *Rearden*, 683 F.3d at 1206) (observing that the Ninth Circuit has "held that trademark rights can vest even before any goods or services are actually sold if the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark . . . .") (quotation marks and citation omitted) (brackets in *Rearden*)). In their view, this principle "is particularly true in an industry such as the real estate industry where yet-to-be-completed buildings are often marketed well in advance of potential occupancy in order to 'create a buzz.'" ECF 52-1 at 18. Although the Obrecht parties acknowledge that "actual apartments were not available for rent on January 5, 2017, when they filed the mark's Statement of Use," they insist that they "most certainly were marketing the leasing of those apartments." *Id.* (citing 15 U.S.C. § 1127) ("'use in commerce' means the bona fide use of a mark *in the ordinary course of trade . . .*") (emphasis added by defendants).

The Obrecht Parties claim, with no evidence in support, that they "have broken ground on" the apartment building, "slated to be called The National Apartments at Brewers Hill[.]" ECF 69 at 22. Yet, in their Counterclaim, filed on July 28, 2017, they describe their Project as "currently a parking lot." ECF 13, ¶ 11. They presented only a picture of a sign adjacent to the prospective building that advertises "The National Apartments," with the words "COMING SOON" and "Apartments for Rent." ECF 52-11 at 2, 6. The sign also included a rendering of the prospective building. *Id.*

Throughout the planning of the Project, the Obrecht Parties "continue[d] to utilize their

website at domain https://thenationalapartments.com/ to promote leasing of space in the building." *Id*. at 26.  And, with no evidence in support, they claim to advertise the apartment "in radio commercials and third party leasing websites, including CoStar, Kettler, CubeSmart, apartments.com, ForRent.com, CommercialCafe.com, and Loop Net[.]"  ECF 69 at 11; *see also* ECF 52-1 at 11.

In addition, the Obrecht Parties claim to use a "cross-marketing strategy" to "generate[] leasing opportunities at [their] other apartment buildings within the PUD."  ECF 69 at 11.  In this regard, they explain, *id*. at 26-27: "[T]he website at thenationalapartments.com provides the contact information for Gunther Land, LLC.  If contacted by a potential customer looking to immediately move into an apartment (versus leasing a unit upon completion of the National Apartment building), Gunther Land refers that person to other residential apartment buildings within the PUD."  The Obrecht Parties maintain that this cross-marketing strategy "certainly" constitutes "use" within the meaning of the Act by "parlaying advertising and marketing for one project to benefit another . . . ."  *Id*. at 27.

The Obrecht Parties rely, in part, on *Rearden*, 683 F.3d at 1205, in which the Ninth Circuit reiterated a "'totality of the circumstances' approach" in assessing whether a mark has been used in commerce.  The Ninth Circuit's adoption of the test has "reflect[ed] a movement away from the previous approach," in which "parties must actually use the mark in the sale of goods or services to acquire ownership in that mark."  *Id*. (internal citation and quotation marks omitted).

In *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001), the Ninth Circuit explained that "the totality of the circumstances must be employed to determine whether a service mark has been adequately used in commerce so as to gain the protection of the Lanham Act . . . ."  The court said, *id.*:

In applying [the totality of the circumstances approach], the district courts should be guided in their consideration of non-sales activities by factors we have discussed, such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the mark service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce."

Indeed, in applying a totality of the circumstances approach, courts have recognized that trademark rights may "vest even before any goods or services are actually sold." *Brookfield*, 174 F.3d at 1052 (citing *New W. Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)); *see also Chance*, 242 F.3d at 1158-59 (observing that "trademark rights can vest even before any goods or services are actually sold if the totality of one's prior actions, taken together, can establish a right to use the mark" (internal quotation marks and brackets omitted)); *Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1138 (D. Colo. 2018) (collecting cases). But, to the extent that advertising alone may satisfy the commercial use requirement, a party may do so only if its activities are "of sufficient clarity and repetition to create the required identification" and have "reached a substantial portion of the public that might be expected to purchase the service." *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1377 (Fed. Cir. 1996).

A case cited by both sides, *Maryland Stadium Authority v. Becker*, 806 F. Supp. 1236 (D. Md. 1992), *aff'd*, 36 F.3d 1093 (4th Cir. 1994), is instructive. There, the Maryland Stadium Authority ("MSA"), the owner of Camden Yards baseball park, filed suit against a vendor, Roy G. Becker, asserting trademark infringement claims under State common law and Section 43(a) of the Act, 15 U.S.C. § 1125(a). MSA alleged that, while a new baseball park was under construction in Baltimore for the Baltimore Orioles, Becker wrongfully used the mark "Camden Yards" in connection with the sale of tee shirts and other items of clothing. 806 F. Supp. at 1237.

In 1989, MSA began the "demolition of old buildings" at the site and in early 1991 it began construction of the baseball stadium, which opened in early April 1992. *Id*. at 1238. In the intervening time, in July 1991, Becker began "selling tee shirts" outside of Memorial Stadium, where the Baltimore Orioles were then playing. Becker's tee shirts displayed, *inter alia*, the phrase "Camden Yards means baseball." *Id*.

MSA had not registered the mark "Camden Yards." *Id*. at 1239. However, Judge Motz determined that MSA's use of the name Camden Yards was sufficient to create trademark rights prior to July 1991, even though "MSA had not sold goods or services with the Camden Yards mark by that time." *Id*. In so concluding, Judge Motz recognized that "[a]dvertising and promotion is sufficient to obtain rights in [an unregistered] mark . . . as long as they occur 'within a commercially reasonable time prior to the actual rendition of service,'" and "as long as the totality of acts 'create[s] association of the goods or services and the mark with the user thereof.'" *Id*. at 1239 (quoting *New W. Corp.*, 595 F.2d at 1200) (internal citation omitted).

Judge Motz observed that geographic locations are considered descriptive word marks. *Id*. at 1239. And, to obtain trademark rights in a descriptive word mark, MSA had to prove 1) that it adopted and used the mark and 2) the mark acquired secondary meaning. *Id*.

In particular, the court looked to MSA's extensive promotional efforts and media coverage given to the ballpark in the years leading up to the opening of Camden Yards. *Id*. at 1239-40. For example, in November 1988, MSA formulated a plan, titled "Camden Yards Sports Complex Development Plan," which was disseminated to "both the public and the press." *Id*. at 1239. And, beginning in July 1989, "MSA published a bi-monthly baseball newsletter" that included phrases such as "ball park at Camden Yards," "Camden Yards site," and "Camden Yards Industrial area." *Id*. at 1239-40. The newsletter, as well as brochures and pamphlets referencing Camden Yards,

were "distributed to the press, to 2,500 readers and to members of the public who made inquiries about the new sports complex." *Id.* at 1240. In addition, MSA published drawings, titled "Camden Yards stadium properties, and its 1990 annual report referred to the project as the Camden Yards sports complex. *Id.* Also, beginning in 1989, MSA held "a number of promotional events at Camden Yards," and in April 1990, it "began conducting regular tours" of the complex. *Id.*

After recounting, in detail, the extensive use by MSA of "Camden Yards," the Court concluded, *id.* at 1240-1241: "[A]t the time that Becker started his business, MSA's promotional efforts had already borne fruit. For any reasonable person to have made any association other than baseball with the Camden Yards name would have been as unlikely as . . . Cal Ripken, Jr. missing a game because of a cold."

Moreover, the same facts established a secondary meaning for the name Camden Yards, before Becker entered the market. *Id.* at 1241. And, the court concluded that Becker's use of the mark was likely to cause confusion as to the source of goods with the name. *Id.*

The evidence submitted by the Obrecht Entities fails to satisfy the standard articulated in *Becker.* They rely on their general usage of the word "National" and related names. But, focusing on the "National Apartments," their advertising consists of a sign outside the building and a webpage, thenationalapartments.com. The website includes four tabs: "Availability," "Amenities," "News," and "Contact." The "Availability" page lists floor plans for studio, one-bedroom, and two-bedroom apartments, but does not list prices or include a link to leasing services. And, the "Contact" page includes the address and phone number of the Obrecht Parties' leasing office. The Obrecht Parties claim that when prospective tenants contact the office, they are redirected to available apartments in other buildings located in the PUD. This evidence does not support the conclusion that the Obrecht Parties' use of "The National Apartments" had a

"substantial impact" on the consuming public. *T.A.B. Sys.*, 77 F.3d at 1376.

The Obrechts suggest that the "National Apartments" cannot be considered "in a vacuum." ECF 69 at 11. The name must be considered, they argue, in light of their extensive redevelopment efforts of the former brewery complexes over the past two decades, and their use of the word "National" and derivates in that context. They assert that they "have consistently and prominently used marks incorporating National throughout the PUD and through many other forms of marketing and advertising." *Id.* at 16.

A decision by the Trademark Trial and Appeal Board ("TTAB"), *In re Genitope Corp.*, 78 U.S.PQ.2d 1819 (T.T.A.B. 2006), addressed the question of whether a single webpage was an acceptable specimen of use in commerce for registration purposes.[22] There, the applicant submitted a page as a registration specimen indicating how a visitor to the website could obtain "'more information on personalized immunotherapy and our product.'" *Id.* at 1822. The cite did not offer a link that a visitor could click to order the product or obtain an explanation of how to order the product. *Id.* The web page offered only the company's name, address, and phone number. *Id.* The TTAB concluded that the page was mere advertising and refused the mark's registration. *Id.*; *see also Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) ("Allowing a mark owner to preserve trademark rights by posting the mark on a functional yet almost purposeless website, at such nominal expense, is the type of token and residual use of a mark that the Lanham Act does not consider a bona fide use in commerce."), *aff'd*, 747 F.3d 929 (7th Cir. 2014).

---

[22] Courts have generally treated TTAB decisions as persuasive authority "entitled to respect" because of the TTAB's "expertise in trademark disputes." *See, e.g.*, *Rosenruist—Gestao E Servicios LDA v. Virgin Enters. Ltd.*, 511 F.3d 437, 459-60 (4th Cir. 2007); *see also Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 863 n.1 (6th Cir. 2017) (collecting cases); *Gruma Corp. v. Mex. Restaurants, Inc.*, 497 F. App'x 392, 396 n.1 (5th Cir. 2012) (collecting cases).

Based on the totality of the circumstances, I am not persuaded. As to "The National Apartments," the Obrechts have not shown adequate use in commerce of the mark "National," and certainly not prior to JFY's actual use. *Int'l Bancorp*, 329 F.3d at 364. To be sure, the Obrecht Parties have vigorously endeavored to associate the PUD with two landmark breweries, National Brewery and Gunther Brewery, which previously occupied the area of the PUD. The Obrecht Parties have gone to great lengths to cultivate themes centered around the breweries, which once thrived in that area. To that end, they have licensed the "Boh Man," decorated buildings using artifacts from the breweries, and restored signage associated with the breweries. But, focusing on the particular mark, "The National Apartments," the Obrechts fail to establish the requisite use in commerce. It follows that the Obrecht Parties are not entitled to summary judgment on their trademark infringement and unfair competition claims.

**5.**

Alternatively, JFY argues that the Obrecht Entities' use of the word "'National' lacks the requisite distinctiveness to qualify as trademark use . . . ." ECF 46-2 at 20. According to JFY, the name "National Apartments if anything, associates itself with the famous brands of the National Brewing Company," and not the Obrechts. *Id.* At most, JFY posits that "National" is a descriptive mark, and thus "proof of secondary meaning in the marketplace is required for the mark to be eligible for protection." *Id.*; *see Perini Corp.*, 915 F.2d at 125; *see also Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1360 (Fed. Cir. 2009). But, the USPTO did not question secondary meaning. Therefore, "[s]ignificant weight must be attached to this registration." *Resorts of Pinehurst*, 148 F. 3d at 422; *see also JFJ Toys, Inc.*, 237 F. Supp. 3d at 330.

In my view, in the context of this case, the word "National" is at most a descriptive mark. As discussed earlier, and as used by the Obrechts, the word "National" refers to the development,

renovation, and restoration of the area that comprises the PUD. It is, in effect, a geographical description.

A descriptive mark cannot serve as a valid trademark without evidence establishing a secondary meaning. *Barcelona.com, Inc. v. Excelentisimo Ayunquamienco Barcelona*, 330 F.3d 617, 629 (4th Cir. 2003). Secondary meaning refers to "the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." *Perini Corp.*, 915 F.2d at 125. As the Fourth Circuit explained in *OBX-Stock, Inc.*, 558 F.3d at 340, secondary meaning, in the context of a geographically descriptive mark, means that "the mark no longer causes the public to associate the good with the geographical location, but to associate the good with a particular product or source of the product."

Proof of secondary meaning must satisfy "'vigorous evidentiary requirements.'" *Perini*, 915 F.2d at 125 (citation omitted). Secondary meaning "'may be established through proof that an appreciable number of consumers are familiar with the marks and the product or services connected to the mark.'" *Teal Bay Alliances, LLC*, 2015 WL 401251, at *12 (citation omitted). In other words, "'a substantial number of present or prospective customers understand the designation . . . to refer to a particular person or business enterprise.'" *Perini Corp.*, 915 F.2d at 125 (citation omitted). Notably, "[i]f a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark." *Id.* Other relevant factors include advertising expenditures; sales success; unsolicited media coverage of the product; attempts to plagiarize the mark; and length and exclusivity of the mark's use. *Perini Corp.*, 915 F.2d at 125.

The evidence here is lacking to demonstrate that consumers associate the word "National" with any goods or services of the *Obrecht Entities*, as opposed to the former breweries and their beer, on which the Obrecht entities have sought to capitalize through their marketing efforts. As JFY puts it, ECF 46-2 at 22, the Obrechts "have benefited . . . from adopting and plagiarizing marks from a family of famous marks – the Boh Man, Gunther, Natty Boh, etc. – associated with National Bohemian beer and the National Brewery." JFY adds: "By design, the Obrecht Entities' marketing to the public attempts to capitalize on the nostalgia associated with the brands of the old beer breweries . . . still often associated with Baltimore lore." *Id.*

Indeed, Mr. Obrecht seemed to acknowledge that the use of the Natty Boh icon is associated with the brewery, not the Obrechts. He testified, ECF 47-39 at 3-4: "In the early 2000s, 2005-ish, we put that huge Mr. Boh head . . . on top of the building . . . which everyone associates with the National beers, Natty Boh, National Premium, that was the logo for National Brewery . . . it became the logo for essentially for the whole brewery."

Mr. Obrecht estimated an expenditure of $200,000 per year on advertising. ECF 47-40 at 3-4. But, he did not specify the amount expended for the National Apartments. And, given the number of Obrecht entities (*see* ECF 50, sealed), the Court cannot assume the money was spent for the Project or even for buildings with related names.

Moreover, the Obrechts were not mentioned in a story that appeared in THE BALTIMORE SUN on October 16, 2018. The article discussed a contribution of $10,000 by the National Bohemian Beer Company towards restoration efforts for the Chesapeake Bay. *See* ECF 61-7 (THE BALTIMORE SUN, October 16, 2018).

In view of the foregoing, the Obrechts have not established a secondary meaning for purposes of entitlement to summary judgment.

Even assuming, *arguendo*, that the Obrechts have a valid mark, "The National Apartments," the Obrecht Parties must establish that JFY's use of the words "The National" on its building is "'likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" *Rosetta Stone Ltd.*, 676 F.3d at 153 (quoting *CareFirst of Maryland, Inc.*, 434 F.3d at 267).

The Obrechts insist that JFY's use of the NATIONAL mark has caused actual confusion among consumers. ECF 52-1 at 23. They contend that both Mr. Penner and Mr. Obrecht testified to actual confusion in the marketplace. *Id.*; *see* ECF 52-3 (Penner Dep.) at 8; ECF 52-3 (Obrecht Dep.) at 21.

Nine factors are relevant to the likelihood of confusion analysis. *Grayson O Co.*, 856 F.3d at 314; *CareFirst of Maryland, Inc.*, 434 F.3d at 267. All nine factors are not always relevant, however. *Grayson O Co.*, 856 F.3d at 314; *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009); *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006). The factors are as follows, *Grayson O Co.*, 856 F.3d at 314:

(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;

(2) the similarity of the two marks to consumers;

(3) the similarity of the goods or services that the marks identify;

(4) the similarity of the facilities used by the markholders;

(5) the similarity of advertising used by the markholders;

(6) the defendant's intent;

(7) actual confusion;

(8) the quality of the defendant's product; and

(9) the sophistication of the consuming public.

Notably, the strength of the mark is "paramount" in determining the likelihood of confusion. *Pizzeria Uno Corp.*, 747 F.2d at 1527. As the Court said in *Grayson O. Co.*, 856 F.3d at 315, "If a mark lacks strength, a consumer is unlikely to associate the mark with a unique source and consequently will not confuse the allegedly infringing mark with the senior mark." In this regard, "the linguistic or graphical 'peculiarity' of the mark" is pertinent "in relation to the product, service, or collective organization to which the mark attaches." *Perini Corp., Inc.*, 915 F.2d at 124 (citation omitted).

To test the strength of a mark, the court must consider "both conceptual strength and commercial strength." *Grayson O Co.*, 856 F.3d at 315. "In determining the commercial strength of a mark, a court considers whether 'a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise.'" *Id.* at 316 (quoting *CareFirst*, 434 F.3d at 269) (citation omitted). And, the commercial strength inquiry "is analogous to the inquiry for secondary meaning." *Grayson O Co.*, 856 F.3d at 316. The factors include: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Perini*, 915 F.2d at 125 (discussing secondary meaning).

With respect to similarity, the court examines the "allegedly infringing use in the context in which it is seen by the ordinary consumer." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992). Here, the mark is not especially strong. More than 7,800 trademarks have been registered with the USPTO incorporating the word "National." ECF 47-41. And, over 400 business entities in the State of Maryland have registered a name that contains the word

"National." ECF 47-44 at 1-437. Moreover, as JFY points out, the "much-publicized National Harbor Development" is "just down the road" in Prince George's County, Maryland, and "not far from the stadium where 'The Nationals' play professional baseball." ECF 61 at 28.

The Obrecht Entities have made extensive use of references to the two storied breweries that once occupied the area of the PUD. They have licensed the smiling Boh Man and have acquired the nonexclusive right to use the words Natty Boh. But, as JFY observes, other Baltimore businesses also make use of the Boh Man, such as Nacho Mamma's and Smyth jewelers. *See* Appendix. And, in contrast to the Obrechts, they have also done so in conjunction with their business names. In any event, the Boh Man logo is "inextricably tied to the National Bohemian Beer and its former brewer . . . ." ECF 61 at 27. The record is devoid of evidence that "a substantial number of present or prospective customers understand the designation ['National'] . . ." to refer to the Obrecht Entities. *Id.*; *see Grayson O Company*, 856 F.3d at 316.

To be sure, the name of the JFY building, "The National," is virtually the same as the proposed name of the Project. But, there is a dearth of evidence to establish that, at the relevant time, any consumer would have considered that the word National on an apartment building belonged to the Obrecht Entities. The word "National" does not appear near the "Mr. Boh" that sits on top of the Natty Boh building. And, the National East building lacks any sign by that name.

It is, of course, noteworthy that the Obrechts' proposed Project is situated in the same general area as to the building that belongs to JFY, although the JFY building is technically not located in the PUD. However, JFY's building is entirely residential and far smaller than the proposed mixed use building contemplated by the Obrechts. It is also not typical for a residential tenant to rent an apartment, sight unseen. And, a visit to the buildings would dispel any potential for confusion.

Similarly, with regard to the Obrechts' "National East" building, the evidence establishes that it is largely occupied by commercial tenants. They are not likely to confuse JFY's residential building with a commercial building.

In sum, for the purpose of summary judgment, the Obrechts have not established confusion based on JFY's use of the mark.

### B. JFY's Counts I and II – Declaratory Relief and Trademark Infringement

As indicated, Count I of the Amended Complaint is filed pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*. ECF 30, ¶ 73. In the suit, JFY asks the Court to enter an order declaring, *id*. ¶ 80:

> (i) that JFY is not making a trademark use of The National and may continue to use The National in connection with the name of its building on the Dillon Street Property; or alternatively, (ii) that if Plaintiff is deemed to be using The National as a trademark, then it is the Plaintiff that possesses superior trademark rights with respect to the use in connection with apartment buildings and related goods and services; (iii) that Plaintiff may continue to use the name "The National" as the name of its building on the Dillon Street Property and continue to conduct the ancillary services, including but not limited to apartment and office rentals; apartment leasing and management; real estate listing services for apartment rentals; property management services for apartment buildings; and renting of apartments; (iv) that Plaintiff is not liable to Defendants or their affiliates for Plaintiff's use of "The National" as described herein; (iv) that neither Defendants nor their affiliates may preclude Plaintiff from using the name "The National" as described herein; and (v) granting Plaintiff such other and further relief as is just.

In Count II, JFY asserts a claim for trademark infringement, pursuant to 15 U.S.C. § 1125(a) of Lanham Act, "[t]o the extent this Court holds that the use of 'The National' as the name of a building constitutes a trademark use, and to the extent that it is determined that Plaintiff is using The National as a trademark in connection with the provision of services[.]" ECF 30, ¶ 82.

The Obrecht Entities seek summary judgment on Counts I and II of the Amended Complaint. But, they failed to address the claims in their briefs. *See* ECF 52-1; ECF 69. Count I

of the Amended Complaint is a declaratory action claim, with its own criteria, which have not been addressed. And, without careful analysis, I cannot summarily conclude that Count II of the Amended Complaint is the flipside of Count I of the Counterclaim. Moreover, plaintiff does not seek summary judgment as to Counts I and II of the Amended Complaint. *See Kinder v. White*, 609 F. App'x 126, 132 (4th Cir. 2015) (observing that "[i]t is not the practice of this court to consider an argument that has not been developed in the body of a party's brief . . . .").

### C.     JFY's Count III – Petition To Cancel Trademark Registration

In Count III of the Amended Complaint, JFY seeks to cancel the registration of the mark "The National Apartments." It seeks summary judgment as to this claim. And, the Obrechts also seek summary judgment.

JFY argues that at the time of Gunther Land's filing of the SOU, the Obrecht Parties were not using "The National Apartments" mark in connection with Class 36 services. ECF 46-2 at 11. Therefore, JFY insists that Gunther Land was not entitled to registration of the mark. Further, it contends that Gunther Land "intentionally and deceptively misrepresented the fact that its [SOU] depicted services being rendered in commerce when in fact no services were being rendered because the building depicted in its specimen had not yet been built." *Id.* at 30.

In response, the Obrecht Entities assert that "there is no evidence that Gunther Land or any of the Obrecht Parties in any way 'knowingly' deceived the USPTO because no such evidence exists." ECF 69 at 25 n.11. They argue that Gunther Land's SOU "accurately depicted their use of the National Apartments mark in commerce and the USPTO accepted" the SOU. *Id.*

Section 37 of the Act, codified at 15 U.S.C. § 1119, "gives federal courts authority to cancel an invalid trademark registration." *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 834 (C.D. Cal. 2018) (citing *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856,

869 (N.D. Cal. 2012), *aff'd*, 737 F.3d 546 (9th Cir. 2013)).  Section 37 provides, in relevant part: "In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part . . . and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

And, 15 U.S.C. § 1120 provides: "Any person who shall procure registration in the [USPTO] of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."  Pursuant to 15 U.S.C. § 1120, "[a] mark shall be canceled if its registration was fraudulently obtained."  *Resorts of Pinehurst*, 148 F.3d at 420 (denying summary judgment where no evidence was offered that the registrant knowingly made a misrepresentation in his declaration).

Cancellation of a trademark registration is appropriate where "'(1) there is a valid ground why the trademark should not continue to be registered and (2) the party petitioning for cancellation has standing.'"  *Synoptek*, 309 F. Supp. 3d at 834 (quoting *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984)).[23]  If successful, the result of a petition "'is the cancellation of a registration, not the cancellation of a trademark.'"  *Belmora*, 819 F.3d at 714 (citing 3 McCarthy § 20:30).  Notably, "[c]ancellation of registration strips an owner of 'important legal rights and benefits' that accompany federal registration, but it 'does not invalidate

---

[23] To establish standing to petition for cancellation under Section 14 of the Act, the petitioner may be "any person who believes that he is or will be damaged . . . by the registration of a mark on the principal register established by this chapter." 15 U.S.C. § 1064.  "A belief in likely damage can be shown by establishing a direct commercial interest."  *East West LLC v. Rahman*, 896 F. Supp. 2d 488, 507 (E.D. Va. 2012) (citing *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1092) (Fed. Cir. 1984) (finding sufficient petitioner's production and sale of merchandise bearing the registered mark)).

underlying common law rights in the trademark.'" *Belmora*, 819 F.3d at 714 (citing 3 MCCARTHY § 20:68).

However, a plaintiff "cannot obtain jurisdiction in the federal courts by relying" on Section 37 alone. 3 MCCARTHY § 30:110. "If one could file suit in federal court solely for cancellation of a registration, this would negate and short-circuit the power of the USPTO Trademark Board to consider such cases[.]" *Id*. Rather, Section 37 creates a remedy for trademark infringement. *See also Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) ("[E]ach circuit to directly address this statutory language has held that it 'creates a remedy for trademark infringement rather than an independent basis for federal jurisdiction.'") (citation omitted). In *Protect-A-Car Wash Systems, Inc. v. Car Wash Partners, Inc.*, 276 F. Supp. 3d 439, 456 (D. Md. 2017), the court observed that "'each circuit to directly address this statutory language has held that it creates a *remedy* for trademark infringement rather than an *independent basis* for federal jurisdiction.'" (Internal citations and quotations omitted) (emphasis added in *Protect-A-Car Wash Systems, Inc.*; *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013).

To prevail on a cancellation claim based on fraud, JFY "must prove by clear and convincing evidence" that the Obrecht Parties "'knowingly ma[de] false, material misrepresentations of fact' and intended to deceive the Patent and Trademark Office." *Id*. (quoting *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 240 (Fed. Cir. 1997)). JFY argues that Gunther Land intentionally made several misrepresentations in documents and statements submitted to the USPTO. For example, JFY contends that in Gunther Land's Response to Office Action (ECF 47-10 at 4-5), Gunther Land misrepresented to the USPTO that the specimen was "a photograph of

an actual building." ECF 46-2 at 30. Gunther Land asserted, in pertinent part, ECF 47-10 at 4 (emphasis added):

> . . . Applicant notes that the one-page document titled "The National Apartments," which is a screen print from the Applicant's webpage that includes a *photograph* of an apartment building immediately under the prominent display of the mark . . . is clear evidence of use of the mark in commerce to promote the services described in the Statement of Use.

According to JFY, Gunther Land's "sole purpose of deceptively referring to the 'drawing' as a photograph was to suggest the existence of 'actual subject matter,' i.e., a building. But no such building existed, and still doesn't." ECF 46-2 at 31. Further, JFY argues that Gunther Land misrepresented that the apartments were available for rent. In its Response to Office Action, Gunther Land stated, in relevant part, ECF 47-10 at 4-5 (emphasis added):

> The specimen described above prominently displays the mark being used to promote an apartment building. Any consumer viewing such webpage would recognize that *the website page promotes apartments available for rent*, and thus at least "rental of apartments," "rental of apartments in an apartment community," and "renting of apartments" all set forth in the description of services. . . . Here, the referenced specimen provides an image of an apartment building, thus identifying to any ordinary, reasonable consumer at least rental and leasing of apartments as the services being offered, and distinguishes them from the services of others through prominent display of the Mark on the page.

JFY contends that that the Obrecht Parties' use of the present tense (". . . the website page promotes apartments available for rent . . . .") suggests that the Obrecht Parties are currently leasing apartments. ECF 46-2 at 31-32. Yet, JFY avers, *id*. at 32: "With no apartment building in existence, no apartments were available for rent that could be promoted or otherwise serviced. The clear intent of the statements and argument to the USPTO was to conceal that fact and to mislead the examiner to believe that there was an actual building being leased to actual tenants."

In this regard, an applicant is required to state under oath, "to the best of [his] knowledge and belief, the facts recited in the application are accurate[.]" 15 U.S.C. § 1051(3)(B). "'The oath

is phrased in terms of a subjective *belief*, such that it is difficult . . . to prove . . . fraud so long as the affiant or declarant has an honestly held, good faith belief.'" *Resorts of Pinehurst*, 148 F.3d at 420 (quoting 3 MᶜCARTHY § 31:76) (emphasis and ellipses in *Resorts of Pinehurst*). And, of relevance here, "the factual question of intent is particularly unsuited to disposition on summary judgment." *Copelands' Enters., Inc. v. CNV, Inc.*, 945 F.2d 1563, 1567 (Fed. Cir. 1991).

Although JFY maintains that Gunther Land made multiple misrepresentations in its submissions to the USPTO, the Court cannot determine, on summary judgment, whether the Obrecht Parties *knowingly* made such misrepresentations. *See Kemin Indus., Inc. v. Watkins Prods., Inc.*, 192 USPQ 327, 329 (TTAB 1976) ("There is, however, a material legal distinction between a 'false' representation and a 'fraudulent' one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like."). Neither side is entitled to summary judgment on this claim.

## IV. Conclusion

For the reasons stated above, I shall DENY the JFY Motion (ECF 46) and I shall DENY the Obrecht Motion (ECF 52).

An Order follows.


Date:   September 27, 2019                                    _____/s/_____
                                                             Ellen Lipton Hollander
                                                             United States District Judge



# THE NATIONAL APARTMENTS

website coming soon







# FOR LEASE

## BREWERS HILL - NATIONAL EAST BUILDING
## BALTIMORE, MD



Canton is Baltimore City's hottest neighborhood, boasting the renovation of historic town homes, development of office, marinas, upscale retail and restaurant properties. The area's proximity to the water, downtown Baltimore and I-95 has made Canton the number one growth area in Baltimore.

Suite Features Include:
• Suite 110: 6,060 Square Feet

Brewers Hill Features Include:
• A mixed use community featuring a blend of office, retail and residential uses
• Prominent entrance next to AOL
• Beautiful appointed space with built-in cubicles, high ceilings and attractive window line.
• On-site amenities include property management office, Canton Self Storage, Friday's Child Daycare, Five Guys Burgers and Fries, Dunkin Donuts, Pasta Mista, PNC Bank, Dogma, Panera Bread and Floyd's 99 Barbershop.
• Easy access to and from I-95, I-895, and Baltimore CBD
• Over 50 restaurants within 1/2 mile
• Free on-site parking
• Corporate environment

FOR MORE **Gail Chrzan**
INFORMATION First Vice President
PLEASE +1 410 244 3129
CONTACT gail.chrzan@cbre.com



OBRECHT 00339

**FOR LEASE**

# PRIME OFFICE SPACE
## NATTY BOH TOWER
## BREWERS HILL

BALTIMORE, MARYLAND 21224



Brewers Hill is a historic renovation and an adaptive re-use of two of Baltimore's greatest and most visible landmarks - The National Brewery and The Gunther Brewery. This is your chance to become part of the dynamic Brewers Hill Community!

**LOCATION:** The corner of O'Donnell Street and Conkling Street, in Baltimore City's historic Canton community

**AVAILABLE:** 7th Floor - ± 4,770 Square Feet

**PROPERTY INFORMATION:**
- A mixed use community featuring a blend of office, retail, and residential uses
- Natty Boh Tower meets the Silver Standard for LEED Green Building
- On-site amenities include property management office, Canton Self Storage, Friday's Child Daycare, Five Guys Burgers and Fries, Dunkin Donuts, Pasta Mista, PNC Bank, dogma, Panera Bread and Floyd's 99 Barbershop!
- Easy access to and from I-95, I-895, and Baltimore CBD
- Over 50 restaurants within 1/2 mile
- Free parking at a ratio of 3:1,000

**FOR MORE INFORMATION PLEASE CONTACT**

**Gail Chrzan**
First Vice President
410.244.3129 - Direct
410.244.7100 - Main
gail.chrzan@cbre.com

**Jeff Boch**
Vice President
410.244.3115 - Direct
410.244.7100 - Main
jeff.boch@cbre.com



OBRECHT 00337



Fig. 1          Fig. 2                    Fig. 3          Fig. 4



Case 1:17-cv-01653-ELH Document 52-13 Filed 10/10/18 Page 3 of 10

OBRECHT 00501